1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8              FOR THE EASTERN DISTRICT OF CALIFORNIA

9

JASON CAMPBELL and
10 SARAH SOBEK, individually,
and on behalf of all other
11 similarly situated current
and former employees of
12 PricewaterhouseCoopers, LLP,,
                                       NO. CIV. S-06-2376 LKK/GGH
13

          Plaintiffs,
14

     v.
15
                                                **O R D E R**
PRICEWATERHOUSECOOPERS, LLP,
16 a Limited Liability Partnership;,
and DOES 1-100, inclusive,
17

          Defendant.
18 _____/

19      This is a wage and hour action brought by plaintiffs Jason

20 Campbell and Sarah Sobek individually and on behalf of other

21 similarly    situated    individuals    against    defendant

22 PricewaterhouseCoopers LLP ("PwC").  Plaintiffs allege that PwC

23 misclassified them as exempt employees under California law and

24 failed to pay them overtime and other benefits that an employer

25 would normally be required to provide to non-exempt employees.

26 Pending before the court is plaintiffs' motion for class

                                  1

certification.[1]   For the reasons explained below, the court provisionally grants the motion with respect to a class comprised of associates in PwC's Attest division.

## I. Factual Background

**A. General Background**

Defendant PricewaterhouseCoopers LLP ("PwC") is the largest public accountancy partnership in the world.  Decl. of William Kershaw, Ex. 3.  PwC has over 30,000 employees in its United States offices, which currently include six California offices in Irvine, Los Angeles, Sacramento, San Diego, San Francisco, and San Jose.  Decl. of Carl Overstreet ¶ 4.  The present suit only involves employees in PwC's California offices.

PwC's organizational structure is complex and multi-tiered.  PwC's subdivision of its professional services begins with three lines of service ("LOS"), which are Assurance, Tax, and Advisory.  Only Assurance and Tax are at issue in this action.  Each line of service is then further divided into divisions.  Overstreet Decl. ¶ 3.  The divisions within each line of service may focus on specialized services, such as external audits, transaction structuring (e.g., mergers and acquisitions, deals), information technology, or consulting work.  Id.

There are several personnel job titles within PwC.  These include associate, senior associate, manager, senior manager,

---

[1] Plaintiffs seek to certify a class under Federal Rule of Civil Procedure 23(b)(3), which provides for an "opt out" class action as opposed to an "opt in" class action.  Cf. 29 U.S.C. § 216(b) (Fair Labor Standards Act).

director, managing director, and partner, Decl. of Jason Campbell ¶ 4; Decl. of Sarah Sobek ¶ 4, with partners generally exercising the greatest authority within PwC's organizational structure. Plaintiffs contend that while PwC requires employees in the positions of manager, senior manager, director, managing director, and partner to hold a Certified Public Accountant ("CPA") license, Campbell Decl. ¶ 5; Sobek Decl. ¶ 5, employees in the positions of associate or senior associate need not be so licensed.

The named plaintiffs in this action, Jason Campbell and Sarah Sobek, worked as associates in the Assurance line of service. Campbell Decl. ¶ 2; Sobek Decl. ¶ 2. The proposed class, however, consists of all unlicensed associates and senior associates who worked for PwC in its Assurance and Tax lines of service in California from October 27, 2002 to the present date. Plaintiffs seek to certify the following class:

> All persons employed by PricewaterhouseCoopers LLP in California, from October 27, 2002 until the time when class notice may be given, who: (1) assisted certified public accountants in the practice of public accountancy, as provided for in California Business and Professions Code sections 5051 and 5053, (2) worked as associates or senior associates in the assurance and tax lines of service, (3) were not licensed by the State of California as certified public accountants during some or all of this time period, and (4) were classified as exempt employees.

**B. Assurance and Tax Lines of Service**

Assurance and Tax are PwC's two largest lines of service. Kershaw Decl., Ex. 3. PwC serves two classes of clients: audit and non-audit (or, in PwC's nomenclature, Channel 1 and Channel 2 clients). Overstreet Decl. ¶ 7. For audit clients, PwC provides

external auditing and financial reporting services in addition to other limited services. Id. For non-audit clients, PwC provides consulting services but no auditing or financial reporting services. Id. This distinction is said to ensure an arm's length relationship between PwC and its audit clients.

There are three divisions within the Assurance line of service in California: Attest, Systems Process Assurance ("SPA"), and Transaction Services. Attest provides financial statement and internal control audits, and only serves audit clients, id. ¶¶ 7-8, while SPA provides services related to information technology ("IT") management controls. Decl. of Michael Corey ¶ 6. SPA services include reviews of database security controls and infrastructure security. Id. ¶ 5. Finally, Transaction Services advises clients on such transactions as mergers and acquisitions and initial public offerings. SPA and Transactional Services both serve audit and non-audit clients. Decl. of Curt Moldenhauer ¶¶ 5, 7; Corey Decl. ¶ 6.

Tax contains a greater number of divisions than Assurance. These include divisions such as International Tax Services, Private Company Services, and State and Local Tax. Decl. of Margaret Barron ¶ 4. The services provided by Tax include tax estimate and tax return preparation for a variety of entities, Decl. of Jacquie Wilson ¶ 7; Decl. of Brian Hunt ¶ 8; Decl. of Joseph Hillsted ¶ 5, advice on compliance with the Internal Revenue Code and international tax treaties, Decl. of Paul Klopping ¶ 6, and review of tax-related entries in quarterly and year-end reports, Decl. of

1  Angela Lam ¶ 8.  Tax serves both audit and non-audit clients.

2  Barron Decl. ¶ 5.

3  **C. Recruiting, Education, and Training**

4      PwC recruits candidates from a variety of backgrounds for its

5  various positions.  PwC employs on-campus recruiting, targeting

6  students graduating in the near future, and experienced recruiting,

7  targeting individuals who have already worked at accounting and

8  professional services firms.  Barron Decl. ¶ 7.  PwC also recruits

9  internally.  Moldenhauer Decl. ¶ 9.

10     Educational background is sometimes a factor in recruiting.

11  Id. at ¶ 10.  For example, preferred candidates for Attest and Tax

12  either hold a degree in accounting or the requisite number of

13  college courses enabling that candidate to sit for the CPA exam.

14  Overstreet Decl. ¶ 11; Barron Decl. ¶ 8.  PwC also generally

15  requires that SPA candidates hold a bachelor's or master's degree

16  in Accounting, Finance, or Computer Science.  PwC, however, may

17  also hire recent college graduates with little or no prior work

18  experience.  Moldenhauer Decl. ¶ 12; Campbell Dep., Ex. 1 (resume);

19  Sobek Dep., Ex. 1 (resume).

20     PwC requires a minimum 40 to 150 hours of annual training for

21  Tax associates and senior associates.  Decl. of Keith Larson ¶ 7.

22  Nevertheless, prior work experience or a previous internship with

23  PwC may decrease the amount of training required for an employee.

24  Decl. of Daniel Goepp ¶ 10.  In addition, training and continuing

25  education requirements vary between lines of service and between

26  divisions.  For example, training offered to new employees in the

1  Attest division may focus on the risk assessment and analytical

2  procedures used in audits, while Tax training may include technical

3  issues associated with tax and simulations focusing on client

4  interaction.  Id.; Larson Decl. ¶¶ 7-12.

5  **D. Duties of Associates and Senior Associates**

6      PwC employed Campbell for a year, from August 2005 to August

7  2006, and employed Sobek for slightly less than two years, from

8  August 2004 to June 2006.  Campbell and Sobek both characterize

9  their job duties as primarily assisting CPAs in performing audits.

10 Campbell Decl. ¶ 2; Sobek Decl. ¶ 2.  Both claim that their job

11 duties on audits involved verifying financial statement items by

12 obtaining and reviewing the underlying documentation that supported

13 the items.  Campbell Decl. ¶¶ 6-7; Sobek Decl. ¶¶ 6-7.  Campbell

14 and Sobek both maintain that they worked in excess of eight hours

15 per day and worked on weekends and holidays without overtime pay.

16 Campbell Decl. ¶ 12; Sobek Decl. ¶ 12.

17     Plaintiffs also maintain that the scope of their duties were

18 necessarily constrained by two standards: (1) Section 5053 of the

19 California Business and Professions Code, which requires the

20 control and supervision of unlicensed accountants, and (2) the

21 professional standards set by the American Institute of Certified

22 Public Accountants, which contain a similar directive.  Plaintiffs

23 allege that PwC's compliance with these rules is evidenced in their

24 policies regarding who is allowed to sign various documents,

25 letters, and reports.

26     PwC has submitted approximately fifty declarations from

individuals in a wide array of positions at PwC (e.g., from associates and senior associates to managers and partners) and from various divisions within both the Assurance and Tax lines of service.  They demonstrate not insignificant variations in the type of work performed by division and by line of service.  They show that the work of the SPA division within Assurance, for example, is centered around information technology (IT).  Decl. of Irina Majstrova ¶ 5.  Similarly, they show that looking across lines of service, Tax associates spend most of their time on the significantly different task of preparing tax returns or tax estimates.  Decl. of Jesse Dang ¶ 7; Decl. of Jacquie Wilson ¶ 7 (80% of time spent on tax returns).  One associate stated that "[i]t is difficult to compare the job duties of, for instance, a SPA Senior Associate with those of an Associate in the Tax line of service because the nature and purpose of the duties are entirely different."  Dang Decl. ¶ 7.

In addition, there are said to be significant differences between the work performed by associates and senior associates, because one of the primary duties of senior associates is to supervise associates.  See, e.g., Decl. of Joseph Gomez ¶ 11 ("When I became a Senior Associate, I spent about 50% to 60% of my time reviewing the work of other Associates.").  The degree of supervision is limited by, inter alia, the legal and professional standards that govern the accounting profession.  As explained below, however, whether the differences between associates and seniors associates are material is a difficult issue, and not

1 without uncertainty.

2 ## II. Standard

3 A party seeking to certify a class must demonstrate that it

4 has met all four requirements of Rule 23(a) and at least one of the

5 requirements of Rule 23(b).  Zinser v. Accufix Research Inst.,

6 Inc., 253 F.3d 1180, 1186 (9th Cir. 2001).  Rule 23(a) allows a

7 class to be certified

8 only if (1) the class is so numerous that joinder of
all members is impracticable, (2) there are questions

9 of law or fact common to the class, (3) the claims or
defenses of the representative parties are typical of

10 the claims or defenses of the class, and (4) the
representative parties will fairly and adequately

11 protect the interests of the class.

12 In other words, the class must satisfy the requirements of

13 numerosity, commonality, typicality, and adequacy.

14 Rule 23(b) provides for three types of class actions.  Here,

15 plaintiff seeks to certify the class under Rule 23(b)(3), which

16 allows for a class to be certified if "the court finds that the

17 questions of law or fact common to the members of the class

18 predominate over any question affecting only individual members,

19 and that a class action is superior to other available methods for

20 the fair and efficient adjudication of the controversy."  Fed. R.

21 Civ. P. 23(b)(3).

22 The matters pertinent to the findings include:

23 (A) the interest of members of the class in
individually controlling the prosecution or defense of

24 separate actions; (B) the extent and nature of any
litigation concerning the controversy already

25 commenced by or against members of the class; (C) the
desirability or undesirability of concentrating the

26 litigation of the claims in the particular forum; and

8

        (D) the difficulties likely to be encountered in the
        management of a class action.

Id.

        The court must conduct a "rigorous analysis" of the moving

party's claims to examine whether the requirements are satisfied,

Gen. Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 161 (1982).

Generally, however, the court should not consider whether the party

seeking class certification has stated a cause of action or is

likely to prevail on the merits.  Eisen v. Carlisle & Jacquelin,

417 U.S. 156, 178 (1974).  Nevertheless, the court is not only "'at

liberty to' consider evidence which goes to the requirements of

Rule 23" but in fact is required to consider such evidence, "'even

[if] the evidence may also relate to the underlying merits of the

case.'"  Dukes v. Wal-Mart, 509 F.3d 1168, 1178 n.2 (9th Cir. 2007)

(quoting Hanon v. Dataproducts Corp., 976 F.2d 497, 509 (9th Cir.

1992)).  If the court concludes that the moving party has met its

burden of proof, the court has broad discretion to certify the

class.  Zinser, 253 F.3d at 1186.

                          **III. Analysis**

**A. Ascertainability of Class**

        Separate from the requirements under Rules 23(a) and (b), and

as a threshold to their analysis, defendant argues that plaintiffs

have failed to propose an ascertainable class.

        An adequate class definition specifies "a distinct group of

plaintiffs whose members [can] be identified with particularity."

Lerwill v. Inflight Motion Pictures, Inc., 582 F.2d 507, 512 (9th

                                9

Cir. 1978).  One of the primary purpose of the class definition is to make it "administratively feasible" for the court to determine individual class membership.  <u>Aiken v. Obledo</u>, 442 F. Supp. 628, 658 (E.D. Cal. 1977).  The class definition should therefore provide the court with objective criteria to discern the class's members.  <u>See</u> <u>O'Connor v. Boeing N. Am., Inc.</u>, 197 F.R.D. 404, 416 (C.D. Cal. 2000).  Such criteria may include, for example, a defendant's own actions and the damages caused by such actions, <u>Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson</u>, 102 F.R.D. 457, 464-65 (N.D. Cal. 1983), or even just geographical boundaries, <u>Berlowitz v. Nob Hill Masonic Mgmt.</u>, 1996 WL 724776, at *5 (N.D. Cal. Dec. 6, 1996).

Nevertheless, the class definition may not consider the merits of the action in determining individual class membership.  <u>See</u> <u>Eisen</u>, 417 U.S. at 177-78; <u>Moore v. Hughes Helicopters, Inc.</u>, 708 F.2d 475, 480 (9th Cir. 1983); <u>Hagen v. City of Winnemucca</u>, 108 F.R.D. 61, 63-64 (D. Nev. 1985) (finding definition of class insufficient when it involved violations of proposed members' constitutional rights).

Defendant's attack on plaintiffs' motion stems from plaintiffs' partial reliance on two statutes to define the class. The proposed class would include individuals who "assisted certified public accountants in the practice of public accountancy, as provided for in California Business and Professions code sections 5051 and 5053."  Section 5051 defines seven acts that are deemed as the "practice of public accountancy," including holding

oneself out to the public as skilled in public accountancy, maintaining an office for the business of a public accountant, and offering to perform certain services such as an audit for compensation.  Section 5053 states that nothing shall preclude an individual who is not certified as an accountant from assisting one who is, so long as the former is under the control and supervision of the latter.

Defendant argues that plaintiffs' reliance of these statutes makes it difficult to discern who should be included in the class. For instance, defendant argues that some of the categories of work in Section 5051 are nonsensical in this context (e.g., they argue that a PwC associate cannot "assist" a CPA in holding himself or herself out to the public as one skilled in public accountancy, or "assist" a CPA in maintaining an office for his or her business). The argument does not lie.  It is far from clear that the proposed ambiguities exist.  Just as a matter of common sense, by assisting the licensed accountant, the employees accomplish the tasks enumerated in the statute, and attacked by defendant.

Even if the court were to agree that incorporation of these two statutes into the class definition introduces an element of ambiguity, courts retain the discretion to alter an inadequate class definition.  See Lamumba Corp. v. City of Oakland, 2007 WL 3245282, at *5 (N.D. Cal. Nov. 2, 2007); Hagen, 108 F.R.D. at 64 (altering definition to remove condition of constitutional violation).  Accordingly, the court could strike the reference to Sections 5051 and 5053 from the class definition, although it

11

appears to the court unnecessary.  In any event, defendant does not challenge the remainder of the class definition, which is sufficiently definite, ascertainable, and administratively feasible.

**B. Requirements under Rule 23(a)**

As noted, Rule 23(a) lists the prerequisites for a class action.  These requirements are (1) the impracticability of joining all members ("numerosity"); (2) the existence of common questions of law or fact ("commonality"); (3) typicality of the claims and defenses of the parties with respect to the proposed class ("typicality"); and (4) adequate representation of the proposed class by the parties before the court ("adequacy of representation").  Fed. R. Civ. P. 23(a); see also Stanton v. Boeing Co., 327 F.3d 938, 953 (9th Cir. 2003).

### 1. Numerosity

Rule 23(a)(1)'s requirement that an attempt to join all parties be "impracticable" does not equate to "impossible."  See Fed. R. Civ. P. 23(a)(1); Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909, 913-14 (9th Cir. 1964).  Instead, an attempt to join all parties must only be difficult or inconvenient. Harris, 329 F.2d at 913-14.  Although impracticability does not hinge only on the number of members in the putative class, joinder is usually impracticable if a class is "large in numbers." Jordan v. Los Angeles County, 669 F.2d 1311, 1319 (9th Cir. 1982), vacated on other grounds, 459 U.S. 810 (1982).  While there is no set number of members required, courts have generally found classes

numbering in the hundreds to be sufficient to satisfy the numerosity requirement. See, e.g., Gay v. Waiters' & Dairy Lunchmen's Union, Local No. 30, 549 F.2d 1330, 1332-34 (9th Cir. 1977) (reversing district court's finding that 184 potential members is insufficient to fulfill Rule 23(a)(1)'s requirements); Sagers v. Yellow Freight Sys., Inc., 529 F.2d 721, 734-35 (5th Cir. 1976) (holding class of approximately 110 members satisfied numerosity requirement); see also James Wm. Moore, Moore's Federal Practice § 23.22[1][b] (Daniel R. Coquillete et al. eds., 3d ed. 2007) (noting forty-one or more members is "usually sufficiently numerous").

Here, plaintiffs contend that they anticipate a class numbering over one thousand members. Kershaw Decl. at ¶ 12. Defendant does not challenge that the numerosity requirement is met. The court therefore finds that plaintiffs have satisfied the numerosity requirement.[2]

**2. Commonality**

Commonality exists when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Rule 23(a)(2) does not require that every or all questions of fact or law be common or identical. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998). Rule 23(a)(2) is also more lenient than the related requirement under Rule 23(b)(3) that common questions of law or fact predominate. Id. In other words, common questions

---

[2] This remains true even if the class were limited to Attest associates.

13

1   exist; but they need not be the predominant questions in the case.

2   Id. Commonality may exist where there is a common legal issue with

3   varied factual predicates, or where there is a common factual basis

4   with varied legal remedies.  Id. at 1019-20.

5       Here, plaintiffs have adequately pled common questions of law

6   or fact.  Common legal questions include whether a license is

7   required to satisfy the professional exemption, whether assistants

8   to licensed accountants may exercise discretion and independent

9   judgment under the laws and professional standards governing

10   accounting, and which duties performed by the class members, to the

11   extent they are shared, should be classified as exempt.  Common

12   factual questions include whether defendant implemented policies

13   and procedures requiring the supervision of class members.  These

14   questions are similar to those that other courts have found

15   sufficient to constitute common questions of law or fact for

16   purposes of Rule 23(a)(2).  See, e.g., Sepulveda v. Wal-Mart

17   Stores, Inc., 237 F.R.D. 229, 242 (C.D. Cal. 2006).  Accordingly,

18   the court finds that the requirement of commonality is satisfied.

19   **3. Typicality**

20       Typicality requires that "the claims or defenses of the

21   representative parties are typical of the claims or defenses of the

22   class."  Fed. R. Civ. P. 23(a)(3).  For typicality to be met,

23   plaintiffs need not possess identical claims to those of the

24   putative class members.  Hanlon, 150 F.3d at 1020.  Instead,

25   plaintiffs' claims need only be "reasonably coextensive" with the

26   claims of the putative class.  Id.  The inquiry focuses on the

claims themselves -- not the factual predicates from which the claims arise.  Hanon v. Dataprods. Corp., 976 F.2d 497, 508 (9th Cir. 1992).  "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'"  Id.

Here, the named plaintiffs allege the same injury as that allegedly suffered by the other class members, e.g., defendant's failure to pay overtime, as a result of the same conduct by defendants, i.e., misclassification.  Their legal claims (and the corresponding statutory bases of such claims) are also the same as those of the other class members.  For example, in addition to failure to pay overtime, plaintiffs also allege that defendant failed to provide meal periods in violation of California Labor Code § 512(a), and failed to provide the statutorily defined compensation for missed meal periods in violation of California Labor Code § 226.7.[3]

Defendant contends, however, that plaintiffs' employment in only a single division of a line of service precludes a finding of

---

[3] Plaintiffs also allege violations of numerous other sections of the California Code, including sections 17200 of the Business and Professions Code and sections 203, 226, 510, 1174, and 1194 of the Labor Code.  However, these violations are contingent upon a finding that plaintiffs were in fact misclassified as exempt employees.

typicality.[4]  This argument is not without foundation.  See Kelley
v. SBC, Inc., 1998 U.S. Dist. LEXIS 18643, at *43 (N.D. Cal. Nov.
13, 1998) (limiting certification to positions plaintiffs actually
held).  Plaintiff responds that there need not be a named plaintiff
with respect to every possible job category.  See Stanton, 327 F.3d
938, 957 (9th Cir. 2003) (finding named plaintiffs to satisfy
typicality with respect to fifteen thousand putative class members,
even though plaintiffs did not represent "various sub-groups" of
class); Cornn v. United Parcel Services, Inc., 2005 WL 588431, at
*7 (N.D. Cal. 2005) (no need for separate class representative for
certain positions).

    In Staton, however, there was a broad cross-section of thirty-
two named employee plaintiffs, which is not the case here.  327
F.3d at 957 ("'The named plaintiffs ... include a very broadly
selected cross-section of the different categories of Boeing
employees.  Salaried and hourly, management and line-worker, union
and non-union are all represented, as are each of the major
geographic hubs . . . and each of the pre-merger companies.'").
Additionally, in Cornn, the court found that there was no material
distinction between the positions that were represented and those
that were not.   2005 WL 588431, at *7.

    The court finds that class certification is appropriate as to

_____

    [4] Defendant alternately argues that typicality is lacking
because the named plaintiffs would be preoccupied with unique
defenses pertaining to their poor job performance, but they have
failed to articulate how this performance impacts whether or not
they should have been classified as exempt.

the positions that plaintiffs actually held.  As noted below, this issue might be better framed as a problem of predominance. Regardless of how the issue is framed, the fact remains that plaintiffs have virtually no knowledge of what associates in other divisions do.  Moreover, based on the evidence submitted by PwC, there appear to be significant differences between the work required by an audit versus the work involved in securing a client's IT infrastructure, or in creating tax provisions for a trust.  In light of the such differences, the court finds that certification is only appropriate to a class of Attest associates.

### 4. Adequacy of Representation

Adequacy of representation requires that "representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  In order for plaintiffs to adequately represent the putative class members, they must demonstrate, first, that they do not possess any conflicts of interest with the class members and, second, that both plaintiffs and their counsel will work to "prosecute the action vigorously" with respect to the entire class.  Stanton, 327 F.3d at 957.

Here, there is no serious dispute as to either part of the analysis.  There is no purported conflict of interest between Campbell and Sobek, on the one hand, and the putative class members, on the other.  Turning to the second part of the analysis, a key consideration is the competency of counsel.  Hanlon, 150 F.3d 1020.  Plaintiffs' counsel has ample experience in California wage-and-hour class action suits.  Kershaw Decl. ¶ 2, Ex. 1.

17

Additionally, both of the named plaintiffs have participated in the litigation process -- a relevant factor to determining adequacy of representation.  See Sepulveda, 237 F.R.D. at 244.  The court therefore finds that plaintiffs satisfy the adequacy of representation requirement.

**B. Requirements under Rule 23(b)(3)**

In addition to the requirements set forth in Rule 23(a), plaintiffs must also satisfy one of the requirements set forth in Rule 23(b).  Here, plaintiffs seek certification pursuant to Rule 23(b)(3), which requires that common questions of law or fact "predominate over any question affecting only individual members" and that a class action be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  As with the other components of the class action inquiry, the court's function is not to pass on the merits. Eisen, 417 U.S. at 178.

**1. Predominance**

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Hanlon, 150 F.3d at 1022 (internal quotation marks omitted).  The inquiry "presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2)." Id.  "'When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an

1 individual basis.'"[5]   Id.   (quoting 7A Wright & Miller, Federal

2 Practice & Procedure § 1778 (2d ed. 1986)).

3       Defendant argues that three exemptions -- professional,

4 administrative, and executive -- may apply to each proposed class

5 member.  The court first discuses the requirements unique to each

6 exemption, and then separately addresses the requirement common to

7 all three exemptions regarding the exercise of independent judgment

8 and discretion.  The latter requirement is arguably the single most

9 important issue, because it is required for every exemption.  In

10 other words, if an employee does not exercise independent judgment

11 and discretion, then that employee is not exempt from overtime,

12 regardless  of  whether  other  exemption  requirements  may  be

13 satisfied.

14                **a. Requirements Unique to Each Exemption**

15                         **i. Professional Exemption**

16       Plaintiffs first argue that common proof can establish that

17 no class member is entitled to the professional exemption.[6]  This

18 common proof consists of the nonexistence of a CPA license from

19 _____

20       [5] Though predominance may be marginal, actions addressing what
   are, in reality, several individual claims may not be practically
21 pursued unless a class action is authorized.  Indeed, such may be
   true in the instant case.
22

23       [6] Section 515 of the California Labor Code states, "[t]he
   Industrial Welfare Commission may establish exemptions from the
24 requirement that an overtime rate of compensation be paid."   The
   regulation for the professional exemption is found in Wage Order
25 No. 4-2001, which governs "PROFESSIONAL, TECHNICAL, CLERICAL,
   MECHANICAL AND SIMILAR OCCUPATIONS."  The same regulation is also
26 published in the California Code of Regulations at title 8, section
   11040.

                                     19

the State of California for each member of the class. It is true that, with respect to one avenue for satisfying the requirements of the professional exemption, a license is required. Cal. Code Regs., tit. 8., § 11040(1)(A)(3) (exemption applies to those who are licensed or certified in the practice of law, medicine, dentistry, optometry, architecture, engineering, teaching, or accounting).[7]

This is not, however, the only avenue for satisfying the requirements of the professional exemption. The exemption provides for two separate avenues: the first (the professional exemption) applies to employees who are duly licensed or certified, whereas the second (the learned professional exemption) applies to those who are "primarily engaged in an occupation commonly recognized as a learned or artistic

---

[7] The exemption provides:

(3) Professional Exemption

A person employed in a professional capacity means any employee who meets all of the following requirements:

(a) Who is licensed or certified by the State of California and is primarily engaged in the practice of one of the following recognized professions: law, medicine, dentistry, optometry, architecture, engineering, teaching, or accounting; or

(b) Who is primarily engaged in an occupation commonly recognized as a learned or artistic profession. . . .

Cal. Code Regs., tit. 8, § 11040(A). In addition, the employee must satisfy other requirements, such as exercise independent judgment and discretion.

profession." Id. at § 11040(1)(A)(3)(b).  Clearly, the proposed class cannot possibly satisfy the first avenue -- since, by definition, it only encompasses unlicensed employees. Predominance, however, is measured by the significance of the issue.  Wamboldt v. Safety-Kleen Systems, Inc., 2007 WL 2409200, at *13 (N.D. Cal. 2007).

Plaintiffs argue that this second avenue (the learned professional exemption) cannot apply to the facts of this case, because it would require disregarding the specific requirements for the recognized profession of accounting in favor of the more general requirements for learned professions.  The argument has great force.  Defendant notes that in Piscione v. Ernst & Young, L.L.P., 171 F.3d 527, 543-46 (7th Cir. 1999), the Seventh Circuit upheld a finding that an unlicensed employee at an accounting firm qualified for the learned professional exemption based on his B.S. in Mathematics and the twenty hours of continuing education required by his employer.[8]  Nonetheless, the court need not engage in detailed examination of the issue at the present juncture.  Even if the learned professional exemption were applicable, it would also present a common predominant question.

To satisfy the learned professional exemption, defendant

_____

[8] Piscione did not address the threshold question of whether an unlicensed employee working in the field of accounting can qualify for the learned professional exemption, or if the non-learned professional exemption essentially preempts the field for accounting-related work.  In this regard, it would be instructive to consider whether unlicensed employees working in other enumerated professions (e.g., medicine, dentistry, optometry, etc.) have been found to qualify for the learned professional exemption.

would need to prove that the class members are primarily engaged in an "occupation commonly recognized as a learned or artistic profession" (as distinct from the non-learned professional exemption, which requires a license). Cal. Code Regs., tit. 8, § 11040(1)(A)(3)(b). A "learned or artistic profession" is defined to include "[w]ork requiring knowledge of an advanced type in a field or science or learning customarily acquired by a prolonged course of specialized instruction and study, as distinct from a general academic education and from an apprenticeship and from training in the performance of routine, manual, or physical processes." Id. at § 11040(1)(A)(3)(b)(i).

Defendant seizes upon the element of specialized instruction and study to argue that the exemption will involve individualized questions. For example, defendant notes that its education-related hiring requirements vary by division and that it offers a multitude of training courses for its employees, which are utilized to varying degrees from individual to individual. But the test considers whether an employee is "primarily engaged in *an occupation* commonly recognized as learned." Id. at § 11040(1)(A)(3)(b) (emphasis added). In other words, the predicate for the learned professional exemption is a qualifying occupation, not a particular individual level of educational attainment. But see Piscione, 171 F.3d at 544-45 (focusing on individual educational attainment). This inquiry presents a common question because it focuses on whether the individual is employed in a qualifying occupation.

Defendant's interpretation of the learned professional exemption, which focuses on the education and training possessed by each individual employee, cannot be reconciled with the language of the exemption.  To illustrate, one component of the exemption may be satisfied by a prolonged course of specialized instruction.  Accepting defendant's interpretation of the exemption would mean that an associate who takes a several month-long training course is potentially employed in "*an occupation commonly recognized as learned*," whereas that associate's colleague down the hall who works in the same division and line of service but who takes a two-week long training course, is not employed in such "an occupation."  The court cannot accept defendant's interpretation, which would embrace such inconsistent results.

Rather, the court finds that the requirements unique to the professional exemption -- setting aside, for the moment, the requirement of discretion and independent judgment -- are susceptible to common proof.

### ii. Administrative Exemption

California law also exempts employees who are primarily engaged in the "performance of work directly related to the management policies or general business operations of [their] employer or [their] employer's customers." Cal. Code Regs., tit. 8, § 11040(1)(A)(2)(a)(i).  Employees who work as advisors and consultants to an employer's customers may qualify for the

administrative exemption.  <u>See</u> Former 29 C.F.R. § 541.205(d).[9]
In order to qualify for the exemption, the work must be directed
to "matters that involve policy determinations, i.e., how a
business should be run or run more efficiently, not merely
providing information in the course of the customer's daily
business operations."  <u>Bratt v. City of Los Angeles</u>, 912 F.2d
1066, 1070 (9th Cir. 1990).  The regulations interpreting the
Wage Orders expressly contemplates that "many persons employed
as advisory specialists and consultants of various kinds
[including] . . . tax experts" may qualify for the exemption.[10]

_____

[9] These regulations have been revised under federal law but
the Wage Orders adopted these regulations as effective on the date
the Wage Orders were adopted.  Cal. Code Regs., tit. 8, § 11040
("The activities constituting exempt work and non-exempt work shall
be construed in the same manner as such terms are construed in the
following regulations under the Fair Labor Standards Act effective
as of the date o this order . . .").  These former regulations are
therefore the legally relevant ones.  A copy of the former
regulations can also be found in the current California Division
of Labor Standards Enforcement (DLSE) Manual.

[10] In light of this fact, plaintiffs' reliance on the
administrative/production worker dichotomy is less than helpful.
Plaintiffs argue that the dichotomy distinguishes between (a)
employees whose duties directly relate to the management policies
or general business operations of its clients versus (b) those
employees whose duties relate to producing the commodity (whether
goods or services) that the enterprise exists to produce and
market.  <u>See</u> <u>Nordquist v. McGraw-Hill Broadcasting Co.</u>, 32 Cal.
App. 4th 555, 563 (1995); <u>Dalheim v. KDFW-TV</u>, 918 F.2d 1220, 1230
(5th Cir. 1990).  But the example of a tax consultant, which the
regulations list as an example of one who qualifies for the
administrative exemption, blurs that dichotomy.  The tax
consultant's work directly relates to the client's business
operations, but the tax consultant's duties also relate to
producing the commodity of his or her enterprise, tax advice.
Similarly, an auditor's work directly relates to the client's
business operations, but the commodity of the auditor's enterprise
is audit advice.

Former 29 C.F.R. § 541.205(c)(5); id. at § 541.205(c)(2) ("[A]
tax consultant . . . is ordinarily doing work of substantial
importance to the management or operation of a business.").

Here, plaintiffs contend that, for two reasons, "no
unlicensed associate within PwC spends more than 50 percent of
his or her time providing advice to PwC's clients on matters of
significance." Reply at 14. First, plaintiffs argue that the
rules of independence governing the accounting profession
prohibit even licensed professionals from functioning as
administrators of a customer's business. But, as even
plaintiffs' expert admitted, these rules do not prohibit licensed
professionals from providing advice or making recommendations "to
assist the client's management in performing its functions and
making decisions." Carradero Decl., Ex. 3, Ueltzen Dep. 111:8-
114:12 (agreeing with opinion rendered by defendant's expert);
see also Decl. of John Toriello ¶ 12 (drafting memorandum to
evaluate client's position of keeping separate financial
statements for itself and a company in which it had fifty percent
ownership). The regulations make clear that those who give
advice, such as consultants, may qualify for the administrative
exemption.

Second, plaintiffs note that PwC's company policy directs
who may and may not sign various documents, letters, and reports
-- the effect of which is to limit giving direct advice to
clients to those above the senior associate level. Because this
policy is not only relevant to determining whether PwC associates

and senior associates are performing work directly related to their client's general business operations under the administrative exemption, but also whether the class members exercise discretion and independent judgment, it is discussed below in that latter context.

### iii. Executive Exemption

PwC also argues that application of the executive exemption will require case-by-case analysis.  The executive exemption requires, among other things, that an employee: (1) manage a customarily recognized department or subdivision thereof; (2) customarily and regularly direct the work of two or more other employees; and (3) make recommendations as to the hiring or firing, and advancement, promotion, or change of status of other employees that carry particular weight.  Cal. Code Regs., tit. 8., § 11040(1)(A)(1).

Here, defendant notes that many, but not all, of the proposed class members serve as the "in charge" (PwC's nomenclature) on engagements and thereby manage a team of other employees.  But a team of employees assembled for a particular engagement is not a "recognized department."  The California Division of Labor Standards Enforcement (DLSE) Manual cautions that "the term 'customarily recognized department or subdivision' has a particular meaning.  The phrase is intended to distinguish between 'a mere collection of employees assigned from time to time to a specific job or series of jobs' and 'a unit with permanent status and function.'"  DLSE Manual at § 53.3.1.

26

Although the question of whether a team of employees working on an engagement constitutes a "recognized department" is one on the merits, there is little dispute as to its answer.  There is no evidence that the teams over which some associates may have "in charge" status are units with *permanent* status and function. Accordingly, because the executive exemption does not apply at all, it does not pose an individualized question for the class.

**b. Requirement Common to All Exemptions: Discretion and Independent Judgment**

Above the court determined whether certain requirements for the professional, administrative, or executive exemptions posed individualized questions.  The court has not yet addressed the requirement common to all three exemptions, however, which is whether the employees at issue "customarily and regularly exercise discretion and independent judgment." Cal. Labor Code § 515(a).

It is this requirement that requires further analysis, for clearly if the class members exercise such powers differently, class certification is suspect.  The term discretion and independent judgment "implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." Former 29 C.F.R. § 541.207(a). "Discretion and independent judgment involves the comparison and evaluation of possible courses of conduct, and acting or making a decision after considering various possibilities." Nordquist, 32 Cal.

App. 4th at 564.

There are two potential components to whether (and how often) an employee exercises independent judgment and discretion: one based on the employee's actual duties and one based on the employer's expectations.  As the California Supreme Court explained it, both these components are problematic:

> On the one hand, if hours worked on [an exempt activity] were determined through an employer's job description, then the employer could make an employee exempt from overtime laws solely by fashioning an idealized job description that had little basis in reality.  On the other hand, an employee who is supposed to be engaged in [an exempt activity] during most of his working hours and falls below the 50 percent mark due to his own substandard performance should not thereby be able to evade a valid exemption.

Ramirez v. Yosemite Water Co., 20 Cal. 4th 785, 802 (1999). Accordingly, Ramirez instructed trial courts to "steer clear of these two pitfalls by inquiring into the *realistic* requirements of the job." Id. (emphasis in original).  "In so doing, the court should consider, first and foremost, how the employee actually spends his or her time. But the trial court should also consider whether the employee's practice diverges from the employer's realistic expectations." Id. Ramirez thus envisions the synthesis of two components, one directed at the employee and one directed at the employer.

The California Supreme Court has also clarified the import of Ramirez in the class action context: an employer's realistic expectations are "likely to prove susceptible to common proof," but how employees actually spend their time "has the potential

28

to generate individual issues."[11]   Sav-On Drug Stores, Inc. v. Superior Court, 34 Cal. 4th 319, 337 (2000).  Of course, whether these individual issues materialize in any particular case turns on whether the job duties at issue vary from employee to employee, or whether they are uniform across employees.[12]

### i. Employer's Realistic Expectations

Plaintiffs argue that the question of whether the proposed class members exercise independent judgment and discretion can be answered by common proof.  The purported common proof is PwC's policy that unlicensed associates must be under the control and supervision of licensed accountants, which plaintiffs contend is a necessary product of the statutes and professional standards governing the practice of public accountancy.  See Cal. Bus. & Prof. Code § 5053 (nothing shall preclude an individual "who is not a [CPA] from serving as an employee of, or an assistant to, a [CPA] . . . if the employee or assistant works under the control and supervision of a [CPA].").  Section 5053 and its

_____

[11] A problem with the latter requirement is that it will almost always limit class actions to jobs that are precisely the same, and which are performed in the same manner.  Such a conclusion would defeat the effect of class actions which permit suit in cases where unlawful conduct would otherwise go uncorrected because of the limited recovery available in individual suits.

[12] In Sav-On, for example, it appears that the duties between class members did not vary significantly; rather, the only question was whether each task fell on the exempt or non-exempt side of the ledger.  See Sav-On, 34 Cal. 4th at 330-31 ("As plaintiffs argued to the trial court, '[t]he only difference between Defendant's declarations and Plaintiffs' evidence is that the parties disagree on whether certain identical work tasks are "managerial" or "non-managerial."'").

implicit  incorporation  into  PwC's  corporate  policies[13]  is
therefore arguably instructive as to PwC's realistic expectations
as an employer.[14]

PwC also has a policy that employees should be compliant
with applicable professional standards.  Kershaw Decl., Ex. 6 at
00661.  Similar to Section 5053, the pertinent professional rules
promulgated  by  AICPA  address  generally  the  supervision  of
unlicensed accounting employees.  Davila Decl., Ex. I (AICPA §
311.11)  ("Supervision  involves  directing  the  efforts  of
assistants who are involved in accomplishing the objectives of
the  audit  and  determining  whether  those  objectives  were
accomplished.").  These rules envision, however, that the amount
of supervision that is appropriate varies on an individual basis.
"The nature and extent of supervision and review must necessarily
reflect wide variances in practice.  The auditor charged with
final responsibility for the engagement must exercise seasoned
judgment in varying degrees of his supervision and review of the
work done and judgment exercised by his subordinates." Id., Ex.
G (AICPA § 210.03).  The factors to be taken into consideration

[13] The PwC-specific policies to which plaintiffs allude are
those pertaining to who may sign various documents, letters, and
reports.

[14] As discussed above, this is only half of the issue, because
the court must also consider "how the employee actually spends his
or her time." Ramirez, 20 Cal. 4th at 802.  But the notion that
the company rules may be disregarded must be rejected.  The fact
that in an individual case or number of cases an employee is
working contrary to the company's rules would not necessarily
undermine the propriety of class certification.

1  include the complexity of the project and the qualifications of

2  the employee.  <u>Id.</u>, Ex. I (AICPA § 311.11).

3      In order to prove that the requirement of discretion and

4  independent judgment is susceptible to common proof based on

5  these standards, plaintiffs must prevail on its argument that

6  compliance with Section 5053 and related professional standards

7  necessarily means that all unlicensed employees are performing

8  non-exempt work.  Put slightly differently, the question is

9  whether being under "control and supervision" precludes the

10 exercise of meaningful discretion and judgment.

11     Defendant relies upon a California Superior Court decision,

12 which it argues is persuasive authority for the issues presented

13 here.  <u>Ruiz v. PricewaterhouseCoopers LLP</u>, Case No. BC 287920

14 (Cal. Sup. Ct. December 8, 2003), involved a trio of overtime

15 lawsuits against several accounting firms, including PwC.  They

16 were brought as private attorney general suits under California's

17 Unfair Competition Law (prior to its amendment by Proposition 64,

18 which subsequently required that all representative actions

19 proceed as class actions).[15]  The plaintiff in that case, like

20 the plaintiffs here, argued that the cases were appropriate for

21 representative treatment because of Section 5053.

22     The <u>Ruiz</u> court noted that Section 5053 "is part of the

23

24     [15]  In an earlier motion, defendant argued that <u>Ruiz</u>
   collaterally estopped class certification here, but the court
25 denied the motion since <u>Ruiz</u> was brought as a private attorney
   general suit, rather than as a class action, precluding the
26 necessity of showing "identity of issues."

31

Accountancy Act, which regulates the licensing and practice of accountants . . . and is not part of the Labor Code of the Wage Orders, which regulate overtime and work conditions." Id. at *5. The court characterized plaintiff's position as requiring an "illogical leap between two completely unrelated statutory schemes." Id. The court also noted that Ramirez required the court to examine "how the employee actually spends his or her time," presumably requiring an individualized inquiry. 20 Cal. 4th at 802. Finally, it held that "as a matter of common sense, exercising discretion and independent judgment is not incompatible with being under the control and supervision of someone else." Id. at 6 (noting that even high-ranking company officers are under the control and supervision of a board of directors or shareholders).

It appears to this court that there is something less than logic in refusing to recognize the relationship, for cases of this type, between the Accountancy Act and the California Labor Code. The question tendered is whether, given the limitations imposed by the Accountancy Act, defendants violated the California Labor Code in treating associates as exempt employees. Clearly, to the extent that the statutes and professional standards are implicitly incorporated into the company's rules, they bear directly on the issues tendered by this motion.

PwC's company rules prohibit the putative class members from signing their names to various documents, letters, and reports. The pertinent regulation states, however, that "[t]he fact that

an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment."  Former 29 C.F.R. § 541.207(e)(1).  For example, an assistant to the president of a large corporation may regularly reply to correspondence addressed to the president. Id.  Although the president may on occasion alter or discard the prepared reply and direct that another one be sent, this action does not destroy the exempt character of the assistant's function.  Id.  Similarly, a "management consultant who has made a study of the operations of a business and who has drawn a proposed change in organization, may have the plan reviewed and revised by his superiors before it is submitted to the client." Id. at § 541.207(e)(2).  In addition, "[t]he policies formulated by the credit manager of a large corporation may be subject to review by higher company officials who may approve or disapprove these policies."  Id.; see also Copas v. E. Bay Mun. Util. Dist., 61 F. Supp. 2d 1017, 1030 (N.D. Cal. 1999) (finding that employee exercised independent judgment and discretion even though his written work and reports were subject to review by supervisors).

Accordingly, the court finds that the fact that the work of PwC associates and senior associate is subject to review is not sufficient to prove that they are performing non-exempt work. Nevertheless, as noted below, the court need not rely upon this fact in certifying a class.  Instead, the court finds that based on the similarity of duties performed by Attest associates, class

33

1 certification is appropriate.

2 ### ii. Employees' Actual Duties

3 Regardless of what policies an employer may establish from
4 the top-down, and regardless of what professional standards may
5 apply at an industry-wide level, what employees actually do, on
6 a day-to-day basis, is a separate matter.  For example, simply
7 because PwC does not have a policy expressly prohibiting
8 discretion and independent judgment does not mean that its
9 employees actually exercise such discretion and independent
10 judgment.  Under Ramirez, the court must inquire "first and
11 foremost" into "how the employee actually spends his or her
12 time."  20 Cal. 4th at 802.  Of course, on a motion for class
13 certification, the issue is narrower: the question is whether
14 that inquiry is susceptible to common proof.

15 Where the relevant duties performed (i.e., those that
16 arguably constitute exempt activity) vary from class member to
17 class member, many courts have found that individual issues,
18 rather than common issues, predominate.  See Jimenez v. Domino's
19 Pizza, 238 F.R.D. 241, 251 (C.D. Cal. 2006) (no predominance of
20 common question where "there were many variable[s] which affected
21 a particular manager's mix of duties"; "the predominating issue
22 in this case is the actual mix of duties worked which entails a
23 need to conduct an individual inquiry for each class member");
24 Sepulveda, 237 F.R.D. at 249 (no predominance of common question
25 where there was "voluminous evidence that there actually was a
26 great deal of variance in [assistant manager] duties"); Pfohl v.

1    Farmers Ins. Group, 2004 WL 554834, at *9 (C.D. Cal. Mar. 1,

2    2004) ("The differing job duties and the individualized inquiry

3    to determine whether these varying duties meet the administrative

4    exemption preclude a collective action in this case."); Perry v.

5    U.S. Bank, 2001 WL 34920473, at *7 (N.D. Cal. Oct. 16, 2001) (no

6    predominant common question "in light of the differences in

7    individual job duties"); Dunbar v. Albertson's, 141 Cal. App. 4th

8    1422, 1431 (2006) (class treatment inappropriate where findings

9    as to one grocery manager could not be extrapolated to 900 other

10   grocery managers due to significant variation in work performed).

11        Conversely, in cases where class treatment was deemed

12   appropriate, the job duties between the class members were

13   similar.  In Tierno, for example, one of the cases relied upon

14   by plaintiffs, the employer argued that the class members' job

15   duties varied from store to store, but upon examination of the

16   record, the court determined that "the Store Manager position at

17   Rite Aid is, in fact, sufficiently similar from store to store

18   in all important respects such that class treatment is

19   appropriate in this case." Tierno v. Rite Aid Corp., 2006 WL

20   2535056, at *9 (N.D. Cal. Aug. 31, 2006).  Similarly, the primary

21   dispute between an employer and its employees may focus on how

22   a single activity undertaken by all class members should be

23   treated.  See, e.g., Morillion v. Royal Packing Co., 22 Cal. 4th

24   575 (2000) (class action by agricultural workers alleging that

25   time spent commuting on employer's bus counted as "hours

26   worked").

The fact that an employer classifies all or most of a particular class of employees as exempt does not eliminate the need to make a factual determination as to whether class members are actually performing similar duties.[16]  In <u>Walsh</u>, for example, the employees argued that if they could prove that the employer deliberately misclassified them as exempt, this policy would constitute a common, predominant issue, "even if individualized proof of a . . . member's work was required to evaluate whether each member's work was exempt."  <u>Walsh v. IKON Office Solutions, Inc.</u>, 148 Cal. App. 4th 1440, 1461 (2007).  The court rejected the argument:

> [Plaintiffs] assume that an employer is liable if it classifies employees without regard to the law or investigating what work they do, even if the employees were, in fact, subject to the exemption.  While such action on the part of an employer may be 'deliberate' and 'willful,' [which might be relevant for waiting time penalties] it is not 'misclassification.'

> In other words, [plaintiffs] cannot recover under Labor Code section 1194 unless the Account Manager Subclass members were not, in fact, subject to the outside salesperson exemption; that determination requires consideration of the individual circumstances of each Account Manager Subclass member.

<u>Id.</u>

Some courts, however, have determined that it is unfair for

---

[16] One court has noted that a "[d]efendant's initial, uniform classification . . . has only minimal relevance to the facts that ultimately must be determined at trial."  <u>Vinole v. Countrywide Home Loans, Inc.</u>, 246 F.R.D. 637, 641 (S.D. Cal. 2007).  Proving a uniform classification is akin to proving the element of standing: naturally, an employee must have been classified as exempt to bring a misclassification claim.  But once that initial hurdle is cleared, the case will ultimately turn on whether the employee was *wrongly* classified as exempt.

an employer to "on the one hand, argue that all [class members] are exempt from overtime wages and, on the other hand, argue that the Court must inquire into the job duties of each [class member] in order to determine whether that individual is 'exempt.'" See, e.g., Wang v. Chinese Daily News, 231 F.R.D. 602, 613 (C.D. Cal. 2005). But, under Walsh, there is no estoppel effect given to an employer's decision to classify a particular class of employees as exempt -- whether right or wrong, or even issued in bad faith; instead, the only legally relevant issue to alleged misclassification is whether the exemption in fact applies.[17] If the duties between class members are similar, the exemption inquiry is likely susceptible to common proof, e.g., Tierno, 2006 WL 2535056, at *9, but if the duties are not sufficiently similar, then the inquiry is unlikely to be susceptible to common proof, e.g., Jimenez, 238 F.R.D. at 251.

Here, both parties have submitted evidence pertaining to the job duties performed by class members. Plaintiffs have submitted two employee declarations (their own) and defendant has submitted

_____

[17] It may be intuitively unfair to permit an employer, who has historically classified a particular group of employees as exempt based on a uniform rule, to argue in the context of litigation that the exemption inquiry will require an individualized analysis. But the assumption behind such an intuitively appealing argument is that an employer should somehow be bound by its prior position -- which is foreclosed by Walsh. "[I]n resolving questions of California law, this court is bound by the pronouncement of the California Supreme Court . . . and the opinions of the California Courts of Appeal are merely data for determining how the highest California court would rule . . . [but] the opinion of the Court of Appeals on questions of California law cannot simply be ignored." Brewster v. County of Shasta, 112 F. Supp. 2d 1185, 1188 n.5 (E.D. Cal. 2000) (internal quotation marks omitted).

approximately fifty employee declarations (from a mix of associate, senior associate, and higher-level employees).  The Campbell and Sobek declarations state that their "daily activities involved assisting CPAs in performing audits for PwC's clients" and that "[e]very audit was essentially performed in the same way."  Campbell Decl. ¶ 6; Sobek Decl. ¶ 6.  They also describe how their duties were prescribed by the "audit plan," a computerized program with a list of financial statement items that needed to be verified.  Id.  Sobek and Campbell both stated that neither they nor "any other associate or senior associate had the authority to prepare or deviate from the audit plan." Sobek Decl. ¶ 8; Campbell Decl. ¶ 8.

Crucially, however, their personal knowledge appears limited, in large part, to one division (Attest) within one line of service (Assurance).[18]  But there are other divisions within Assurance in addition to Attest: Systems Processing Assurance and Transactional Services.  Campbell testified during his deposition that he did not know much about the job duties of associates in these other two divisions.  Campbell Dep. 22:22-23:2.[19]  Sobek's

_____

[18] This issue is also raised in defendant's motion to strike. The court discusses the relevant issues raised by that motion but finds that the arguments primarily go to the weight of the evidence rather than its admissibility.

[19] "Q. Do you know what associates do in the [Transactional Services] division?
A. No, I do not.
Q. Do you know what associates do in the [Systems Processing Assurance] division do?
A. Specifically, no, I do not."

testimony was slightly more informed than Campbell's on this issue, but she too only possessed general information.  Sobek Dep.  229:19-230:6;  231:4-7.[20]   With  regard  to  the  duties performed by associates in the Tax line of service, Sobek and Campbell said that the associates help to perform tax returns, but could not offer any specific details whatsoever.[21]  Campbell Dep. 22:11-21; Sobek Dep. 230:7-13.

PwC has submitted a small mountain of declarations.  Upon review, two consistent findings emerge, both of which dovetail with the limitations in Sobek and Campbell's testimony.  First, they attest to significant differences in the work performed between divisions and between lines of services.  Some employees work on IT, some work on tax returns, some work on reviewing quarterly and year-end reports, some work on transactions, and some work audits.  See, e.g., Majstrova Decl. ¶ 5; Dang Decl. ¶ 7; Wilson Decl. ¶ 7.  Whether framed as an issue of typicality under Rule 23(a)(3) or predominance under Rule 23(b)(3), the court finds that certification would be improper if not limited to the Attest division where plaintiffs actually worked.

Second, it appears that there is a meaningful distinction

---

[20]  "Q.  Do you know what the duties were of a [Systems Processing Assurance] associate, generally?
A. They basically did SAS-70 type work, the controls.  I'm not sure.  That's all I knew of them."

[21]  Of course, plaintiffs need not personally possess such information, but Campbell and Sobek's depositions and declarations are the only pieces of evidence submitted by plaintiffs on the duties performed by PwC associates and senior associates.

between associates and senior associates' duties. A significant if not primary responsibility for senior associates is to review the work of associates. See, e.g., Gomez Decl. ¶ 11 ("When I became a Senior Associate, I spent about 50% to 60% of my time reviewing the work of other Associates."); Decl. of Ryann Lucas ¶ 17 ("As an associate, I spent 50% of my time on an engagement preparing the documentation, whereas as a Senior Associate, I spent less time preparing (no more than 30%) and more time reviewing the work of others."). Senior associates also tend to spend more time helping to prepare the audit plan, interacting with clients, and communicating with PwC managers and partners. See, e.g., Decl. of Michael Anderson ¶¶ 8-9. The question is whether these duties potentially involve the exercise of independent judgment such that the inclusion of senior associates would render class treatment inappropriate. Under the circumstances, there does seem to be a sufficiently significant difference between associates and senior associates to warrant exclusion of the latter group from the class.

Although there is also some evidence of variation in the duties performed by associates within the same division, the duties are nevertheless sufficiently similar to warrant class treatment. For example, it appears that many Attest associates test the client's "internal controls," such as the requirement that checks be signed by someone other than the person who draws it. Decl. of Ashlee Pierce ¶ 10; Decl. of Blair Krebs ¶ 11. Similarly, many Attest associates perform "detail testing," in

which a sample of items from major account balances is selected
and a search of hard evidence of those items is performed.  Decl.
of Denise McCurry ¶ 16; Decl. of Michael McCarvel ¶ 11.  Based
on the similarities in duties performed by Attest associates, the
court finds that there is a common, predominant question of law
or fact.  Cf. Tierno, 2006 WL 2535056, at *9.

### c. Other Claims

Plaintiffs also allege a host of claims that are derivative
of, or dependent upon, a finding that PwC misclassified its
employees.[22]  Although the parties dispute whether each of these
claims presents individualized or common issues, even in the
aggregate these claim are not particularly significant.  Rather,
the key issue upon which certification must rise or fall is
whether common questions of law or fact predominate in the main
exemption inquiry.

### 2. Superiority of Class Resolution

Rule 23(b)(3) also requires that class resolution be
"superior to other available methods for the fair and efficient
adjudication of the controversy."  The relevant inquiry is
determined by analyzing the four factors in Rule 23(b)(3)(A-D).
Hanlon, 150 F.3d at 1023.  Most these factors indicate that class
resolution is a superior method in this case.

First, "the interest of members of the class in individually

---

[22] These include, for example, waiting time penalties, Cal.
Labor Code § 203, wage statement claims, Cal. Labor Code § 226, and
meal and rest break claims, Cal. Labor Code §§ 512(a) & 226.7.

controlling the prosecution or defense of separate actions" must give way to two competing concerns: the reality that class members may fear reprisal in pursuing individual claims against their employer, and the fact that individual litigation against a well-funded defendant would be cost prohibitive. See Scott v. Aetna Servs., Inc., 210 F.R.D. 261, 268 (D. Conn. 2002).

Second, "the extent and nature of any litigation concerning the controversy" is not a concern, as neither party has identified any related, pending litigation.

Third, "the desirability or undesirability of concentrating the litigation of the claims in this particular forum" does not weigh heavily on either side.

Fourth, although there may be manageability issues, they are significant only if they create a situation that is less fair and efficient than other available techniques. In re Sugar Industry Antitrust Litigation, 73 F.R.D. 322, 358 (E.D. Pa. 1976). Manageability concerns must be weighed against the alternatives and "will rarely, if ever, be in itself sufficient to prevent certification of a class." Klay v. Humana, Inc., 382 F.3d 1241, 1272 (11th Cir. 2004).

Accordingly, the court finds that the requirements of Rule 23(b)(3) are satisfied here.

## IV. Conclusion

For the reasons set forth above, the court GRANTS the motion with respect to Attest associates but DENIES the motion with respect to senior associates and non-Attest associates.

42

1    The court notes that the above determination is one
2 involving a controlling question of law and there is substantial
3 ground for difference of opinion and that an immediate appeal
4 from the order will materially advance the ultimate termination
5 of the litigation.

6    ACCORDINGLY, the court certifies the matter for
7 interlocutory appeal pursuant to 28 U.S.C. § 1292.[23]

8    IT IS SO ORDERED.

9    DATED:  March 24, 2008.

10

11

12                        _____
                         LAWRENCE K. KARLTON
13                        SENIOR JUDGE
                         UNITED STATES DISTRICT COURT
14

15

16

17

18

19

20

21

22

23

24

25 _____

26   [23] The court also calls the parties' attention to Federal Rule
of Civil Procedure 23(f).

43