1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8              FOR THE EASTERN DISTRICT OF CALIFORNIA

9
JASON CAMPBELL and
10  SARAH SOBEK, individually,
and on behalf of all other
11  similarly situated current
and former employees of
12  PricewaterhouseCoopers, LLP,,
                                      NO. CIV. S-06-2376 LKK/GGH
13
         Plaintiffs,
14
     v.
15
PRICEWATERHOUSECOOPERS, LLP,              **O R D E R**
16  a Limited Liability Partnership;,
and DOES 1-100, inclusive,
17
         Defendant.
18  _____/

19      This is a wage-and-hour action brought by plaintiffs Jason

20  Campbell and Sarah Sobek, individually and on behalf of other

21  similarly   situated   individuals,   against   defendant

22  PricewaterhouseCoopers LLP ("PwC"), the largest accounting firm in

23  the world.  Plaintiffs allege that PwC misclassified them as exempt

24  employees under California law, failed to pay them overtime, and

25  failed to provide other benefits that an employer must provide to

26  non-exempt employees under California law.

                                  1

Pending before the court are cross motions for summary judgment or partial adjudication on the issue of whether members of the plaintiff class, unlicensed employees with the position of Attest Associate at PwC's California offices, were properly classified as exempt employees.[1] The court grants plaintiffs' motion. PwC's motion further (and separately) challenges plaintiffs' claims for waiting time penalties and for punitive damages. Because plaintiffs have not responded to these challenges, the court concludes that these claims are abandoned, and PwC's motion is granted in this respect.

## I. BACKGROUND[2]

---

[1] At various places both plaintiffs and defendants refer to class members as unlicensed accountants. It appears to the court, however, that such a designation may beg the question that is in issue.

[2] Several evidentiary objections and motions to exclude are pending. Plaintiffs have moved to exclude the expert declaration of Michael Moomaw. PwC relies on this testimony solely in arguing that class members exercise discretion and independent judgment. Because the court does not reach this issue, plaintiffs' objection is moot.

Plaintiffs also move to exclude the testimony of Donna Dell. The stated purpose of Dell's declaration is to "provide an opinion . . . as to . . . the appropriateness under California and federal law of applying the 'learned professional' criteria contained in the [IWC wage order] to certain non-licensed accounting professionals." Dell Decl., ¶ 7. Dell also opines on the relationship between Cal. Bus. & Prof. Code § 5053 and the wage order. These legal conclusions are an improper subject for expert testimony, and are excluded. See, e.g., Mukhtar v. Cal. State Univ., 299 F.3d 1053, 1066 (9th Cir. 2002) (citing McHugh v. United Serv. Auto. Ass'n, 164 F.3d 451, 454 (9th Cir. 1999)). The agency documents attached as exhibits to Dell's declaration are not excluded.

PwC conversely objects to the declarations of Michael Ueltzen and named plaintiffs Jason Campbell and Sarah Sobek. Because the court does not rely on these declarations, these objections are moot.

2

## A.    General Background

PwC has over 30,000 employees in its United States offices. In California, PwC maintains six offices, in Irvine, Los Angeles, Sacramento, San Diego, San Francisco, and San Jose. Decl. of Carl Overstreet, ¶ 4. Plaintiff class consists solely of employees of the California offices. The two named plaintiffs, Jason Campbell and Sarah Sobek, were employed by the Sacramento office.

PwC's organizational structure is complex. PwC's professional services are divided into three lines of service, which are designated Assurance, Tax, and Advisory. Overstreet Decl. ¶ 3. The assurance division is further subdivided into the Attest, Systems Process Assurance, and Transaction divisions. The certified class encompasses only employees in the Attest division.

Within the Attest division, there is a seven tiered hierarchy of personnel job titles. From bottom to top, these levels are associate, senior associate, manager, senior manager, director, managing director, partner. Individuals at or above the level of manager are required to hold CPA licenses, whereas associates and senior associates need not be licensed. The Attest division may also employ interns, who work below associates. Plaintiff class consists only of unlicensed associates who are within the Attest division, and work in California offices. In total, the class

---

Finally, PwC objects to plaintiffs' introduction of portions of the "PwC Audit Guide" and other internal PwC documents on the ground that these have not been properly authenticated. These documents bear indicia of authenticity sufficient to satisfy Fed. R. Evid. 901.

1  includes approximately 2000 members.

2  **B.  PwC's Attest Division**

3      In essence, the Attest division performs audits.  The audits

4  seek to assure that a company's financial statements are prepared

5  in  accordance  with  Generally  Accepted  Accounting  Principles

6  ("GAAP"), and are free of misstatements, whether caused by error

7  or fraud.  See Overstreet Decl. ¶ 7.  The ultimate recipient of

8  PwC's audit work is the client company's Board of Directors, often

9  through  the  board's  audit  committee.    These  audits  demonstrate

10 clients' compliance with various regulatory mandates, and may also

11 provide a necessary predicate for access to investment capital.

12     In  addition  to  verifying  compliance,  the  Attest  division

13 provides  some  advice  to  clients.    The  scope  of  this  advice  is

14 limited by statutory and professional independence rules.   These

15 rules preclude PwC from performing management functions for clients

16 of the attest division, although PwC may "provide advice, research

17 materials, and recommendations to assist the client's management

18 in performing its functions and making decisions."  Decl. of Norman

19 Hile in Supp. PwC's Mot. Summ. J., Ex. 3 (Decl. of Ruben Davila ¶

20 45, Appendix J - ET 101-3); see also Decl. of William Kershaw in

21 Supp.  Pls.'  Reply,  ("Kershaw  Decl.  II")  Ex.  1,  114:18-115:9.

22 Consistent with this limit, when PwC identifies deficiencies in the

23 client's  accounting  in  the  course  of  the  audit  process,  PwC

24 communicates such findings, as well as recommendations arising from

25 them,  to  the  client.    This  communication  takes  the  form  of

26 "management letters" that are among the documents delivered to the

4

client at the end of the audit process.   PwC's Undisputed Facts Supp. Summ. J. ("UF") 89-90.

PwC refers to the work performed on behalf of a particular client as an "engagement."  The team working on an engagement does not persist from project to project, and has no other significance within PwC.   Within any particular engagement, associates and senior associates may serve as the "in charge," and some class members have performed this function.  PwC's UF 94.  The "in charge" reports to and is supervised by the manager, and "helps to manage the day-to-day activities of the engagement."  Overstreet Decl. ¶ 16.   The "in charge" designation is particular to an individual engagement, and is not a permanent position.

**B.    What Do Attest Associates Do?**

Within the Attest division, all attest associates are unlicensed and assist Certified Public Accountants (CPAs).  Attest associates' primary obligation is to verify financial statement items by obtaining and reviewing their underlying documentation.

The parties sharply disagree about the nature of class members' work within the Attest division.  Many of these disputes are not material to the present motions, because the court resolves the motions on other predicates.  Two questions are salient: the degree of supervision over class members, and whether class members perform work directly related to the internal administration of PwC.

Class members' supervision is mandated by two sets of standards.  The first is California Business and Professions Code

§ 5053, which requires "control and supervision" of unlicensed employees. The second is the professional standards set by the American Institute of Certified Public Accountants, which contains a similar directive. PwC's internal policies confirm that PwC complies with these standards. For example, associates are prohibited from signing documents communicating substantive opinions, conclusions or determinations to clients. Kershaw Decl. II, Ex. 3, PWC 00670; Ex. 4 at PWC 00938 (excerpting PwC's internal documents); see also id. at Ex. 1, 131:13-22; Ex. 2 67:23-77:4, 79:1-8, 123:24-125:2 (depositions of PwC's Fed. R. Civ. P. 30(b)(6) witnesses). In addition, PwC requires that all associate work be subjected to at least one level of detailed review. Id. at Ex. 6, PWC 02770; Ex. 7, PWC 010230. Review "has to include the reviewer being satisfied with both the quality of the work done and the quality of the documentation in the Client file." Id. at Ex. 7, PWC 010230.

PwC argues that class members participate in PwC's internal administration in two ways. Class members have served on internal committees, such as the "Unique People Experience," "Great Place to Work," and "Connectivity" committees. PwC's UF 102. These committees serve essentially social functions, e.g., "to bring people in the Banking group together," Hile Decl., Ex. 14 (Decl. of Ashlee Pierce, ¶ 23) (Unique People) and to improve relationship "between PwC employees and the community, as well as the relationships between various members of the PwC community." Hile Decl., Ex 17 (Decl. of Lambert Shui, ¶ 7) (Great Place to Work and

6

Connectivity).  Class members spend a minority of their time on these projects.  Pierce Decl. ¶ 23 ("2 to 10 hours per month"), Shui Decl. ¶ 7 (up to 500 hours annually).

Furthermore, some evidence indicates that class members supervise other associates, complete performance evaluations for those they supervise, prepare initial drafts of engagement budgets, and are involved in monitoring budgets.  PwC's UFs 95-97, 99-100. Neither party has directed the court to evidence of how much time is spent on any of these activities.

**C.   Statutory and Regulatory Background**

Plaintiffs' claims allege violations of various provisions of the California Labor Code, as well as a violation of California's Unfair Competition Law.  California Labor Code section 515(a) authorizes the California Industrial Welfare Commission ("IWC") to "establish exemptions from [these laws] . . .  for executive, administrative, and professional employees, provided [inter alia] that the employee is primarily engaged in duties that meet the test of the exemption, [and] customarily and regularly exercises discretion and independent judgment in performing those duties." Cal. Lab. Code § 515(a).  These exemptions are defined in "wage orders," regulations promulgated by the IWC.  More generally, the IWC "is the state agency empowered to formulate regulations (known as wage orders) governing employment in the State of California." Tidewater Marine Western, Inc. v. Bradshaw, 14 Cal. 4th 557, 561 (1996) (citing Cal. Lab. Code §§ 1173, 1178.3, 1182), Nordquist v. McGraw-Hill Broad. Co., 32 Cal. App. 4th 555, 561 (1995).

The IWC has promulgated different wage orders that apply to distinct groups of employees. See Cal. Code Regs. tit. 8, §§ 11010-11170. The parties agree that the regulation applicable to the employees in this case is Wage Order No. 4-2001, covering "Professional, Technical, Clerical, Mechanical and Similar Occupations," published at Cal. Code. Regs. tit. 8, § 11040.

Enforcement of the wage orders is the province of a separate agency, the California Division of Labor Standards and Enforcement ("DLSE"). "[T]he Legislature empowered the DLSE to promulgate necessary 'regulations and rules of practice and procedure,'" and DLSE has issued manuals, opinion letters, and bulletins interpreting the wage orders. Bradshaw, 14 Cal. 4th at 570 (citing Cal. Lab. Code § 98.8.) However, Bradshaw held that the DLSE manuals under consideration (promulgated prior to 1996) were enacted in violation of the California Administrative Procedures Act, and as such, the Court refused to give "weight to the DLSE's interpretation of the wage orders" contained therein. Id. at 576. Under Bradshaw, the reasoning of these manuals may still be considered, but the manuals are entitled to no deference. Since Bradshaw was decided, DLSE has issued two updated versions of its manual. It is unclear whether the APA problems have been resolved. The DLSE website currently states that "Pursuant to Executive Order S-2-03, the DLSE opinion letters and the Enforcement Policies and Interpretations Manual are currently under review to determine their legal force and effect and to ensure compliance with the requirements of the Administrative Procedures Act."

http://www.dir.ca.gov/dlse/Manual-Instructions.htm

In contrast to the manuals, the California Supreme Court has held that DLSE opinion letters, which are not subject to the same APA requirements, are persuasive authority. <u>Morillion v. Royal Packing Co.</u>, 22 Cal. 4th 575, 584 (2000).

**II. STANDARD FOR SUMMARY JUDGMENT UNDER FED. R. CIV. P. 56**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970); <u>Poller v. Columbia Broadcast System</u>, 368 U.S. 464, 467 (1962); <u>Jung v. FMC Corp.</u>, 755 F.2d 708, 710 (9th Cir. 1985); <u>Loehr v. Ventura County Community College Dist.</u>, 743 F.2d 1310, 1313 (9th Cir. 1984).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" <u>Id</u>. Indeed, summary judgment should be entered, after adequate time for discovery and

9

upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979), cert. denied, 455 U.S. 951 (1980).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Anderson, 242 U.S. 248-49; Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank, 391 U.S. at 290; T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); International Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); Poller, 368 U.S. at 468; SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S.

at 587 (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962) (per curiam)); <u>Abramson v. University of Hawaii</u>, 594 F.2d 202, 208 (9th Cir. 1979).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

## III. ANALYSIS

Both parties seek summary judgment or adjudication on the question of whether class members are exempt employees under one of the three exemptions provided in the 2001 wage order, for professional, executive, or administrative employees.  Exemption is an affirmative defense to be claimed by an employer, and the burden of showing exemption ultimately lies on defendant.  <u>Ramirez v. Yosemite Water Co.</u>, 20 Cal. 4th 785, 794-95 (1999).

Much of the briefing and evidence submitted in this case concerns a requirement common to all three exemptions, that employees exercise "discretion and independent judgment."  Although this requirement is "arguably the single most important issue," Class Cert. Order at 19, it a necessary, but not a sufficient,

12

element of exemption.  As explained below, analysis of the factors particular to each exemption demonstrates that plaintiffs are entitled to summary judgment as to all three exemptions on other grounds.

## A.    Professional Exemption

The crux of the parties' dispute is whether the Attest Associates may be exempt under the wage order's "Professional Exemption."  This provision exempts any employee "who meets all of the following requirements:"

> (a)   Who is licensed or certified by the State of California and is primarily engaged in the practice of one of the following recognized professions: law, medicine, dentistry, optometry, architecture, engineering, teaching, or accounting; or
>
> (b)   Who is primarily engaged in an occupation commonly recognized as a learned or artistic profession. For the purposes of this subsection, "learned or artistic profession" means an employee who is primarily engaged in the performance of:
>
>     (i)   Work requiring knowledge of an advanced type in a field or science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, . . . ; or
>
>     (ii)  Work that is original and creative in character in a recognized field of artistic endeavor . . . ; and
>
>     (iii) Whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work) . . . .
>
> (c)   Who customarily and regularly exercises discretion and independent judgment in the performance of duties set forth in subparagraphs (a) and (b).
>
> [(d) - (i) omitted]

Cal. Code Regs., tit. 8, § 11040(1)(A)(3).  The court refers to subsection (a) as the "enumerated professions" exemption and subsection (b) as the "learned professions" exemption.[3]

---

[3] The parties refer to these as the "recognized" and "learned" exemptions.  However, this terminology engenders confusion when

13

Defendants argue that class members, who are unlicensed employees who assist licenced accountants, may be exempt under subsection (b), the "learned professional" exemption. Plaintiffs argue that, <u>inter alia</u>, defendant's interpretation of the regulation renders subsection (a), the "enumerated professional" exemption, surplusage. Defendants reply that excluding the enumerated professions from the learned professions would, <u>inter alia</u>, contradict settled expectations about who may be exempt--for example, plaintiffs' reading would mean that new law firm associates awaiting their bar passage results were non-exempt employees.

Although both parties' arguments carry great force, the court adopts plaintiffs' construction. The court reaches the following conclusions, explained in further detail below. Arguably, the issue turns on whether the "or" at the end of paragraph "a" is conjunctive or disjunctive. The regulatory text itself is ambiguous as to whether unlicensed employees engaged in an enumerated profession may be exempt under the learned professions exemption. Moreover, the various agency interpretive documents do not explicitly or clearly speak to this question. Turning to the problem of surplusage, subsection (a), the enumerated professions provision, is surplusage unless application of that provision exempts an employee who would otherwise be non-exempt, or vice

"recognized professions" are contrasted with professions "recognized as . . . learned." The attest associates are not engaged in an artistic profession.

versa. The court concludes that the enumerated professions provision does not exempt any employees who would otherwise be non-exempt, because the regulatory history and interpretive documents make it clear that absent the enumerated professions provision, all licensed or certified members of those professions would satisfy the requirements of the learned professions provision. These same interpretive authorities, however, do not provide a clear indication as to whether or not the enumerated professions are excluded from the learned professions provision--the point ultimately at issue in this case. Faced with this ambiguity, the court's obligations to avoid surplusage constructions and to construe the wage orders in favor of employees both compel the conclusion that the unlicensed accounting assistants do not fall within the learned professions exemption.[4]

**1. Principles Governing Interpretation of the Wage Order**

The wage order is interpreted according to principles of California law. The California Courts of Appeal have concluded that wage orders are "quasi-legislative regulations," and as such, are to be "construed in accordance with the ordinary principles of statutory interpretation." <u>Singh v. Superior Court</u>, 140 Cal. App. 4th 387, 393 (2006) (citing <u>Collins v. Overnite Transportation Co.</u>,

---

[4] The court would be less than frank not to recognize the difficulties this interpretation tenders for some of the employees identified in PwC's brief. They are not before this court and thus no opinion concerning them need be reached. I note in passing, without intending to suggest resolution of other issues, that at least arguably the work engaged in by the class members is more like the work of paralegals than law clerks.

105 Cal. App. 4th 171, 179 (2003)); see also Ramirez, 20 Cal. 4th at 801 (concluding that in general the wage orders were "quasi-legislative," although a provision not at issue in this case also "interpreted" the statutory exclusion of outside salesmen.).

"When construing a statute, a court's goal is to ascertain the intent of the enacting legislative body so that [the court] may adopt the construction that best effectuates the purpose of the law." Gattuso v. Harte-Hanks Shoppers, Inc., 42 Cal. 4th 554, 567 (2007) (internal quotation omitted); see also People v. Arias, 45 Cal. 4th 169, 177 (2008). The first step in this process is to look to the "ordinary meaning" of the statute's words "in their statutory context," because this "is usually the most reliable indicator of legislative intent." Gattuso, 42 Cal. 4th at 567. However, "[l]iteral construction should not prevail if it is contrary to the legislative intent apparent in the statute; and if a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed." Arias, 45 Cal. 4th at 177; see also Gattuso, 42 Cal. 4th at 567. "A statute is regarded as ambiguous if it is capable of two constructions, both of which are reasonable." Hughes v. Bd. of Architectural Examiners, 17 Cal. 4th 763, 775 (1998).

In resolving an ambiguity in a statute (and, by extension, a quasi-legislative regulation), interpretations by an agency charged with administering the statute are persuasive, but not controlling, authority. Yamaha Corp. of America v. State Bd. of Equalization, 19 Cal. 4th 1, 11 (1998); see also Jones v. The Lodge at Torrey

Pines Partnership, 42 Cal. 4th 1158, 1173 (2008).  Thus, both IWC and DLSE interpretations of the wage orders may be informative. Morillion, 22 Cal. 4th at 584.

Finally, the California Supreme Court has held that "statutes governing conditions of employment are to be construed broadly in favor of protecting employees."  Murphy v. Kenneth Cole Productions, Inc., 40 Cal. 4th 1094, 1103 (2007) (citing Sav-On Drug Stores, Inc. v. Superior Court 34 Cal. 4th 319, 340 (2004), Ramirez, 20 Cal. 4th at 794, and Lusardi Construction Co. v. Aubry, 1 Cal. 4th 976, 985 (1992)).

**2.   Class Members Are Engaged in The Profession of Accounting**

The tension between the enumerated and learned professions provisions is only relevant to this case if class members are primarily engaged in the enumerated profession of "accounting," as opposed to some other activity, perhaps "accounting assistance." As I now explain, class members are engaged in accounting within the meaning of the wage order.

The California Business and Professions Code defines "public accounting" to include the practices of "prepar[ing] . . . for clients reports on audits or examinations of books or records" and "making audits . . . as a part of bookkeeping operations for clients."  Cal. Bus. & Prof. Code §§ 5051(d), (f).  It is undisputed that class members assist in this type of audit activity.  PwC's UF 29, 34, 39-43.

Moreover, the Business and Professions Code permits

17

uncertified individuals to serve as assistants to certified accountants provided that they are subject to their control or supervision of a certified accountant. Cal. Bus. & Prof. Code § 5053. One California court has held that uncertified individuals "remain free to perform . . . accounting services[;]" they are only prohibited from advertising themselves as public accountants. Carberry v. State Bd. of Accountancy, 28 Cal. App. 4th 770, 775 (1994); see also Cal. Bus. & Prof. Code §§ 5055-5056. In sum, it appears that California law does not prohibit class members from performing accounting work provided that they are subject to supervision, in the sense that accountants might also perform these tasks in the course of performing their professional duties, and the undisputed facts demonstrate that class members are in fact engaged in such work.

### 3. The Structure of the Wage Order Is Ambiguous

Plaintiffs' first argument on this issue is that the structure of the wage order and the associated language compel the conclusion that the learned and enumerated professions do not overlap. The Professional Exemption begins by providing that to be exempt, and employee must satisfy "all of the following requirements," i.e., that all of subsections (a) through (i) must to be satisfied for an employee to fall under the professional exemption. The question is whether "or" separating (a) from (b), indicates a disjunction. It would be absurd to conclude that, to be an exempt professional, an employee must both be licenced in a enumerated profession and engaged in a learned or artistic profession, and neither party

advocates this interpretation. Instead, the professional exemption

applies to an employee who satisfies one of (a) or (b), and all of

(c) through (i).

Plaintiffs accept this interpretation, but argue that in order

to give effect to the conjunctive, compulsory meaning of "all," an

employer must not be able to choose between subsections (a) and

(b). Plaintiffs therefore propose reading "all of the following

requirements" to mean "all applicable requirements," and

interpreting subsections (a) and (b) as mutually exclusive, such

that only one may apply to any particular employee.

The structure of the wage order, and in particular the words

"all" and "or," does not itself compel this interpretation. The

concurrent use of the words "all" and "or" creates some tension,

but at most, this demonstrates some ambiguity. The words "all of

the following requirements" alone do not oblige the conclusion that

the enumerated and learned professions do not overlap.[5] The court

---

[5] In a related argument, plaintiffs also rely on the term "primarily engaged," arguing that one cannot be simultaneously primarily engaged in both a learned and a recognized profession. Plaintiffs assume that the two cannot be the same thing, whereas this assumption is precisely the question at issue.

Finally, plaintiffs seek to bolster their structural argument with a lengthy discussion of the distinction between the inclusive and exclusive meanings of "or." It is true that "or" has two meanings. An inclusive-or means "either A, or B, or both A and B." An exclusive-or means "either A or B, but not both A and B." This distinction, although sometimes useful in logic, has no relevance here. Strictly speaking, treating the "or" in the wage order as an "exclusive-or" would not mean that a profession could not be both enumerated and learned; it would instead mean that an employee who belonged to such a profession was not exempt. See generally Jon Barwise & John Etchemendy, Language, Proof, and Logic (2002).

therefore turns to the substance of these two subsections, to determine whether there is an interpretation that permits the two to overlap while giving meaning and effect to each.

### 4. The Content of Subsections (a) and (b)

The enumerated professions are not explicitly excluded from the learned professions.  However, under California law, the controlling issue is the IWC's intent.  <u>Arias</u>, 45 Cal. 4th at 177, <u>Gattuso</u>, 42 Cal. 4th at 567.  Both parties cite various interpretive documents which they argue are probative of this intent.  Plaintiffs also argue that an intent to exclude must be inferred because subsection (a) would otherwise be surplusage.

The court therefore examines the history and development of the wage order, as well as the various interpretive documents, to answer the related questions of whether such an exclusion is necessary to give meaning to subsection (a), and whether the IWC or DLSE have recognized such an exclusion.  Neither of these questions is necessarily controlling.  A surplusage construction should be avoided "unless absolutely necessary," <u>Arias</u>, 45 Cal. 4th at 180, and the available agency interpretations are at most persuasive authority.

### a. Development of the Wage Order

The court reviews three separate versions of the wage order: the 1980 wage order, which predated adoption of the "learned professional" language; the 1989 wage order, which adopted the term; and the 2001 wage order, which is presently in effect, and which substantially changed the structure of the exemption.

      **i.    The Wage Order Prior to Adoption of the Term**

                **"Learned Professional"**

The exemption section of the relevant 1980 wage order provided that

> No person shall be considered to be employed in an administrative, executive, or professional capacity unless one of the following conditions prevails:
> (1) The employee is engaged in work which is primarily intellectual, managerial, or creative, and which requires exercise of discretion and independent judgment, . . . ; or
> (2) The employee is licensed or certified by the State of California and is engaged in the practice of one of the following recognized professions: law, medicine, dentistry, pharmacy, optometry, architecture, engineering, teaching, or accounting.

Former Cal. Code. Regs. tit. 8, § 11040(1)(A) (1980). Thus, this order differed from the present order in that, <u>inter alia</u>, it lacked a "learned professions" exemption, and it included an exemption for employees engaged in "primarily intellectual" work.

Contrary to defendant's assumption, the "primarily intellectual" and "learned professions" exemptions are not the same. In 1984, DLSE issued an Interpretive Bulletin addressing whether, under this order, an unlicensed accountant could be an exempt employee under the "primarily intellectual" provision. (Dell Decl., Doc. 275, p. 13-14.) The bulletin provided that because these subsections (1) and (2) were stated disjunctively, an accountant could in principle qualify under either one, and an unlicensed accountant was not excluded from the primarily

21

intellectual exemption. However, the DLSE stated that such
qualification was unlikely.

> It is reasonable to conclude that the
> Commission, when it used the phrase "primarily
> intellectual," intended that the kinds of
> activities associated with the day-in and day-
> out conduct of the work of an accountant or
> other occupations covered by the order would
> not be "primarily intellectual." Otherwise,
> the exemption--and perhaps the entire Order--
> would be meaningless.

Id. Thus, pursuant to the DLSE interpretation, even most certified
accountants did not do work which was "primarily intellectual."
Interpretations of the learned professional exemption show that it
differs in this regard.

The enumerated professions provision of the 1980 wage order
therefore served to expand the scope of the exemption, as many
licensed enumerated professionals would not otherwise be exempt.
Conversely, the enumerated professions provision did not effect any
contraction on the scope of the wage order's exemptions, as
employees within the enumerated professions--licensed or not--were
not excluded from the "primarily intellectual" provision. See DLSE
Opinion Letter of February 28, 1989 (Def.'s RJN Ex. 1) (citing the
1984 interpretive bulletin for the proposition that "certain
accountants who are not CPAs may still qualify as professionals if
they meet the alternative requirements for the professional
exemption," i.e., the primarily intellectual test.).

            **ii.   The 1989 Wage Order, and The Stated Purpose of**
                 **The Learned Professional Exemption**

In 1989, the IWC amended the wage order to exempt individuals

"engaged in an occupation commonly recognized as a learned or artistic profession."[6]   Former Cal. Code Regs. tit. 8, § 11040(1)(A)(2) (1989).   This learned professions exemption was added to the enumerated professions provision, and did not replace the primarily intellectual provision.   The 1989 wage order provided that

> No person shall be considered to be employed in an administrative, executive, or professional capacity unless one of the following conditions prevails:
> (1) The employee is engaged in which work is primarily intellectual . . . ; or
> (2) The employee is licensed or certified by the State of California and is engaged in the practice of one of the following recognized professions: law, . . . or accounting, or is engaged in an occupation commonly recognized as a learned or artistic profession.

Former Cal. Code Regs. tit. 8, § 11040(1)(A) (1989).   The IWC's "Statement of Basis" for the new rule explained that

> Emerging occupations, such as those in the fields of science and high technology, . . . while exempt under federal law, rarely, if ever, qualified for a professional exemption under the IWC Orders. . . . In response to [various] concerns, . . . the IWC decided that the professional exemption relied too much on credentialism. Consequently, the IWC proposed language which would add persons engaged in an occupation commonly recognized as a 'learned or artistic' profession to the licensed professionals already listed in the order. This broad language would eliminate the need for the IWC to modify the list . . . each time it wished to recognize a new group of professionals, because it would allow

---

[6] The 1989 DLSE opinion letter cited in the preceding paragraph was released prior to the adoption of this amendment, and the letter interprets the 1980 wage order.

enforcement staff to consider individual situations and actual duties when applying the exemption.

IWC's Statement As To the Basis Upon Which Industrial Welfare Commission Order No. 4-89 Is Predicated, Section 1, Applicability (1989); see also DLSE Opinion Letter 1997.03.05.

The statement of basis demonstrates that one purpose of the learned professions provision is to expand the scope of the exemption beyond the enumerated professions. This document does not demonstrate whether the learned professions provision was also intended to expand the scope of the exemption within the enumerated professions. Although the IWC stated that the learned profession allowed consideration of "individual situations and actual duties," the stated purpose of such consideration is to "recognize . . . new group[s] of professionals." It seems unlikely that such "new groups" would include groups of unlicensed individuals within the enumerated professions. Similarly, while the IWC criticized reliance on "credentialism," this criticism could be directed toward either the focus on individual employees' credentials, or the focus on professions for which credentials are available.

Despite the above ambiguity, the statement of basis makes it clear that the relationship between the enumerated professions and the learned professions is not the same as the relationship between the enumerated professions and the "primarily intellectual" exemption. The 1984 DLSE interpretive bulletin concluded that the "primarily intellectual" and enumerated professions provisions generally referred to different types of employees, such that the

24

enumerated professions provision exempted many employees whose work was not primarily intellectual. In contrast, the IWC's statement of basis for the 1989 wage order implies that the only difference between enumerated professions and the learned professions is whether IWC has had an opportunity to specifically enumerate the profession. The 2001 wage order further supports this conclusion.

### iii. The 2001 Wage Order

The present wage order was adopted in 2001. This order was the first to separate administrative, executive and professional employees into different categories. Within the professional exemption, the order deleted the "primarily intellectual" exception, moved the "learned professions" from the "recognized professions" to a separate provision, and added the current language describing what constitutes an exempt learned profession. The IWC "developed the duties that meet the test for the professional exemption" by referring to the then-applicable federal regulations. IWC Statement of Basis for the 2001 Wage Orders. As part of this elaboration, the IWC adopted the federal regulation's requirement that a learned professional's work be "predominantly intellectual and varied in character." Cal. Code Regs. tit. 8 § 11040(1)(A)(3)(b)(iii). The present order's text furthermore explicitly refers to specific sections of the former regulation for use as interpretive authority. Id. § 11040 (1)(A)(3)(e).

By emulating and referring to the federal regulations, the IWC further indicated that in general, the learned professions refer to the same type of work as the enumerated professions. The

25

federal scheme lacks an analogous "enumerated professions" provision. Instead, doctors, lawyers, and accountants are exempt from federal labor laws because they fall under the general "learned professions" exemption for positions "requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized instruction and study." Former 29 C.F.R. § 541.301(a) (2001).

This brings the court to the crux of this case. The fact that the federal learned professional exemption includes the professions enumerated by the California wage order, and that the IWC copied this language, indicates that the enumerated professions are also learned professions. However, rather than copying the federal scheme entirely, the IWC chose to preserve a separate enumerated professional exemption. Plaintiffs suggest that this decision provides a counter-indication that the enumerated professions are not learned professions for purposes of the California wage order. The IWC and DLSE interpretive documents surprisingly do not directly address this question. What these documents do indicate is that, absent exclusion from the learned professions, the enumerated professions provision is surplusage.

**b. Neither DLSE Nor IWC Has Addressed Whether Accountants May Be Learned Professionals**

Contrary to the parties' contentions, neither DLSE nor IWC has addressed whether enumerated professions are also learned professions. Defendant places significant emphasis on the DLSE's conclusion under the 1980 wage order that accountants, including

26

unlicensed accountants, may be engaged in work that is "primarily intellectual." This interpretation does not apply to the learned professional exemption. At the time this interpretation was provided, the learned professional exemption had not been adopted. When the learned professional exemption was added, it was not added to the subsection containing the primarily intellectual exemption. Moreover, the history of the two provisions at the least strongly suggest that they identify different types of employees, and serve different purposes in the wage order. Therefore, notwithstanding the fact that the present learned professions exemption requires that learned professionals' work be "predominantly intellectual," (a requirement borrowed from the former federal regulations, <u>see</u> former 29 C.F.R. § 541.306), the DLSE's interpretations regarding the former primarily intellectual exemption do not apply to the learned professional exemption.

Next, plaintiffs argue that the 1998 DLSE Manual (interpreting the 1989 wage order) indicates that unlicensed employees engaged in the enumerated professions cannot be exempt as learned professionals. In the 1989 order, the term "learned professions" occurred in a separate clause of the same subsection as the enumerated professions. The 1998 manual states that "Employees exempted under the nine enumerated professions must be . . . licensed," § 37.1.1, and that "License or certification means that while a certified public accountant is exempt, an uncertified accountant is not," § 37.1.3. Because the manual did not provide any reasoning for this conclusion, it is unclear whether the

27

manual's statements refer to exemption under that subsection, or
merely under the enumerated professions clause.  In light of both
this uncertainty and the DLSE manuals' potential invalidity under
the California APA, the court does not give weight to this
argument.  See Bradshaw, 14 Cal. 4th at 570.

In 2002, the DLSE released an updated manual.  Like the 1998
manual, the new manual may have been adopted without compliance
with the California APA.[7]  In addition, the manual does not clearly
speak to the question at issue.  The new manual notes that "some
employers erroneously believe that anyone employed in the field of
accountancy . . . will qualify for exemption as a professional
employee by virtue of such employment.  While there are many exempt
employees in [the field of accounting], the exemption of [an]
individual depends upon his or her duties and the other listed
criteria."  2002 DLSE Manual, § 54.10.6.2.  By explaining that an
accounting employee's exemption status depends on his duties, the
DLSE implied that a license is not the sole determinative factor.
See also id. § 54.10.6.3.  However, this may merely reflect the
fact that even a licensed accountant must engage in duties
requiring discretion or independent judgment.[8]  Furthermore, the

_____

[7] As noted above, the DLSE website currently states that
"Pursuant to Executive Order S-2-03, the DLSE opinion letters and
the Enforcement Policies and Interpretations Manual are currently
under review to determine their legal force and effect and to
ensure compliance with the requirements of the Administrative
Procedures Act."

[8] The DLSE may also have meant that an accountant's duties may
render his or her exempt under the administrative or executive
exemptions.  This interpretation would be in some tension with the

enumerated professions provisions' licence requirement may be one of the "other listed criteria" identified by the manual.

Finally, plaintiffs cite a 2003 DLSE opinion letter regarding whether unlicensed teachers may be exempt. The opinion letter stated that "there is no indication that the Commission intended to undo the clearly defined intent to limit the teacher exemption to those workers meeting the definition contained in the Order by allowing those workers to be exempted under the learned professional categories." Pls.' RJN at Ex. B, 7-6, Doc. 300. The DLSE based this conclusion on a later provision of the wage order, that explicitly states that "'Teaching' means, for purposes of section 1 [which includes all the exemption provisions] of this order, the profession of teaching under a certificate from the Commission on Teacher Preparation and Licensing or teaching in an accredited college or university." Cal. Code Regs. tit. 8 § 11040(1)(R). The wage order does not similarly define accounting, and thus, does not express an analogously forceful intent to limit the availability of exemptions for accountants.

### c. Absent An Exclusion, The Enumerated Professions Provision Is Surplusage

The court therefore turns to plaintiffs' surplusage argument. A regulatory provision is surplusage when it is "redundant" or "does not add meaning." Black's Law Dictionary, 8th Edition, 1484.

court's conclusion below that the statutorily mandated supervision of unlicensed accountants precludes their qualification for the administrative exemption.

29

A surplusage construction is to be avoided. "In analyzing statutory language, we seek to give meaning to every word and phrase in the statute to accomplish a result consistent with the legislative purpose." Hughes, 17 Cal. 4th at 775. "[E]very part of a statute be presumed to have some effect and not be treated as meaningless unless absolutely necessary." Arias, 45 Cal. 4th at 180.

Under a strict view, a provision lacks meaning when, if that provision was deleted, the application of the regulation would nonetheless produce the exact same outcome in every case.[9] For subsection (a), the enumerated professions provision, to change the outcome of the application of the professional exemption, it must either (1) identify some employees who are exempt even though they are not learned professionals, or (2) identify some employees who would be exempt as learned professionals if subsection (a) was deleted from the regulation, but whom subsection (a) nonetheless renders non-exempt.[10]

Prior to the adoption of the learned professions exemption,

---

[9] Thus, although some provisions may be purely illustrative, courts should avoid interpreting a provision as such unless the regulation compels this interpretation. Arias, 45 Cal. 4th at 180 (surplusage constructions avoided "unless absolutely necessary"); see also Lamie v. United States Tr., 540 U.S. 526, 536 (2004) (In evaluating an interpretation that would make the inclusion of "attorney" in a list of compensable individuals surplusage, noting that "our preference for avoiding surplusage constructions is not absolute.").

[10] To return to plaintiffs' earlier argument, in the above sentence, the "or" is inclusive--subsection (a) would have meaning if it both included some additional employees and excluded other additional employees.

the enumerated professions provision did the first of these things, because it was the only exemption applicable to, e.g., most accountants. However, under the current wage order, all licensed enumerated professionals also satisfy the requirements of the learned professionals exemption (unless the enumerated professions provision specifically excludes them from it), so the enumerated professions provision no longer expands the scope of the professional exemption.[11] Therefore, the enumerated professions provision does not affect the application of the wage order, and is therefore surplusage, unless it excludes some employees who would otherwise be exempt.[12]

### 5. Conclusion on The Professional Exemption

For the reasons stated above, the language of the wage order is ambiguous as to the meaning of the enumerated professions provision. Neither party's interpretation of the professional exemption is so unreasonable that it must be rejected out of hand. Hughes, 17 Cal. 4th at 775.

Nothing in the text of the regulation itself suggests that the enumerated professions cannot also be learned professions. If the

---

[11] Note that under this interpretation of surplusage, the enumerated professions provision does not have any meaningful effect if it causes certain employees to be excluded from the learned professions provision only to exempt exactly that same group of employees. In such a case, the outcome of the application of the wage order would remain the same.

[12] Plaintiffs suggest that employees engaged in an enumerated profession should also be excluded from the administrative and executive exemptions. The above surplusage argument lends no support to this suggestion, and the court is not aware of any other authority to this effect.

court could interpret this text alone, it might interpret the
learned professions provision in the way the DLSE interpreted the
former "primarily intellectual" provision; i.e., as setting an
overlapping, but generally stricter, set of criteria. However, the
IWC's intent is controlling, and when the text is considered in
light of the history of the wage order's development and the
various agency interpretive documents, it appears that the IWC
intended for the learned professions provision to have a broader
meaning, in that it extends the professional exemption to
additional professions. What is less clear is why, when the IWC
rewrote the wage order by borrowing language from the federal
regulations, the IWC deliberately preserved the enumerated
professions provision. It may be that this decision was
inadvertent, and that the IWC did not intend for the present
enumerated professions to have any meaning at all. This court,
however, must assume the contrary. <u>Arias</u>, 45 Cal. 4th at 180.[13]

Faced with this ambiguity, the California Supreme Court's
instructions to avoid surplusage constructions, <u>Arias</u>, 45 Cal. 4th
at 180, and to construe ambiguous statutes in favor of employees,
<u>Murphy</u>, 40 Cal. 4th at 1103, both strongly suggest the conclusion

---

[13] <u>See also</u> <u>Bell v. Farmers Ins. Exchange</u>, 87 Cal. App. 4th
805, 812 (2001). In interpreting the 1989 wage order, the <u>Bell</u>
court refused to adopt an interpretation of "primarily
intellectual" exemption that would render the phrase
"administrative, executive or professional capacities" surplusage.
However, <u>Bell</u> drew additional support for this conclusion from the
fact that the phrase "administrative, executive or professional
capacities" was added to the regulation at a later date than the
term "primarily intellectual," a circumstance not present here.

that employees primarily engaged in accounting cannot be exempt under the learned professionals provision, Cal. Code Regs., tit. 8, § 11040(1)(A)(3)(b). Accordingly, the court adopts this conclusion.

The court expresses no opinion on whether other specific employees engaged in the enumerated professions, such as law firm associates whose bar admissions are still pending, may be learned professionals. As Justice Holmes wrote, "the life of the law has not been logic; it has been experience." The Common Law, 1 (1881). The experience of those cases will be markedly different, both in terms of the history of the wage order's enforcement and the absence of administrative agencies' statements that such individuals are routinely wrongly classified.

**B. Executive Exemption**

The executive exemption requires, among other things, that an employee: (1) manage a customarily recognized department or subdivision thereof; (2) customarily and regularly direct the work of two or more employees; and (3) make recommendations as to the hiring or firing, advancement, promotion, or change of status of other employees that carry particular weight. Cal. Code Regs., tit. 8, § 11040(1)(A)(1). PwC argues that some class members meet these requirements by virtue of serving as the "in charge" of engagements.

In this court's class certification order, the court held that the "team of employees assembled for a particular engagement is not a 'recognized department.'" Class Cert. Order, 26:18-20. "Although

33

the question of whether a team of employees working on an
engagement constitutes a 'recognized department' is one on the
merits, there is little dispute as to its answer. . . .
Accordingly, . . . the executive exemption does not apply at all."
Id. at 27. If this question was left unresolved by the
certification order, it is now clear that engagements are not
customarily recognized departments.

A "customarily recognized department or subdivision" must be
"a unit with permanent status and function." Former 29 C.F.R. §
541.104(a), referred to by Cal. Code Regs. tit 8 §
11040(1)(A)(1)(e). PwC cites Sutton v. Engineered Sys., Inc., 598
F.2d 1134, 1137 (8th Cir. 1979) in support of its defense, which
held that a project "with an expected work period of 480 calendar
days" could be a recognized department. PwC, who bears the burden
of proof on this issue, has not directed the court to any evidence
that could indicate that any engagement has such effectively
permanent status. This reason is itself sufficient to grant
summary adjudication for plaintiffs on this issue.

**C.  Administrative Exemption**

The administrative exemption's requirements fall into three
categories. First, an employee's duties and responsibilities must
involve "The performance of office or non-manual work directly
related to management policies or general business operations of
his/her employer or his employer's customers." Cal. Code Regs.
tit. 8, § 11040(1)(A)(2)(a)(I). To be directly related, the work
must be of "substantial importance." Bratt, 912 F.2d at 1069

34

(citing former 29 C.F.R. § 541.205); <u>see</u> Cal. Code Regs. tit. 8 § 11040(1)(A)(2)(f) (adopting this provision of the former CFR).

Second, the employee must satisfy one of the following: the employee must "regularly and directly assist[] a proprietor, or an employee employed in a bona fide executive administrative capacity," the employee must "perform[] only under general supervision work along specialized or technical lines requiring special training, experience, or knowledge," or the employee must "execute[] under only general supervision special assignments and tasks." § 11040(1)(A)(2)(c)-(e).

Third, the employee must "customarily and regularly exercise[] discretion and independent judgment." § 11040(1)(A)(2)(b).[14]

Here, defendant argues that class members perform exempt work in administering both PwC and PwC's clients. The evidence indicates that class members may perform some work directly related to the administration of PwC. However, no class members are "primarily engaged in duties that meet the test of the exemption," as California courts have interpreted this term. § 11040(1)(A)(2)(f); <u>see</u> <u>Ramirez</u>, 20 Cal. 4th at 802. Class members are therefore not exempt under the administrative exemption.

**1.    The California Courts' Interpretation of "Primarily Engaged In"**

"The 'primarily engaged' element has been construed to require that the employee spend at least fifty percent of his or her time

---

[14] The professional and executive exemptions contain analogous requirements.

on work that meets the test of the exemption." <u>Ho v. Ernst & Young</u>
<u>LLP</u>, 2009 U.S. Dist. LEXIS 5294 (N.D. Cal. Jan. 15, 2009) (citing
<u>Combs v. Skyriver Communications, Inc.</u>, 159 Cal. App. 4th 1242,
1267 (2008)).  In evaluating whether employees are primarily
engaged in exempt duties, the court considers both the employees'
actual duties and the employer's expectations.  As the California
Supreme Court noted in <u>Ramirez</u>, however, both these components are
problematic:

> On the one hand, if hours worked on [an exempt
> activity] were determined through an
> employer's job description, then the employer
> could make an employee exempt from overtime
> laws solely by fashioning an idealized job
> description that had little basis in reality.
> On the other hand, an employee who is supposed
> to be engaged in [an exempt activity] during
> most of his working hours and falls below the
> 50 percent mark due to his own substandard
> performance should not thereby be able to
> evade a valid exemption.

<u>Ramirez</u>, 20 Cal. 4th at 802 (discussing whether, under a separate
wage order, a requirement  that an employee spend at least fifty
percent of his time as an outside salesman was satisfied).
Accordingly, <u>Ramirez</u> instructed trial courts to "steer clear of
these two pitfalls by inquiring into the <u>realistic</u> requirements of
the job."  <u>Id.</u> (emphasis in original).  "In so doing, the court
should consider, first and foremost, how the employee actually
spends his or her time.  But the trial court should also consider
whether the employee's practice diverges from the employer's
realistic expectations."  <u>Id.</u>  <u>Ramirez</u> thus envisions the synthesis
of two components, one directed at the employee and one directed

36

at the employer.

The California Supreme Court has also clarified the import of Ramirez in the class action context. An employer's realistic expectations are "likely to prove susceptible to common proof," but how employees actually spend their time "has the potential to generate individual issues." Sav-On Drug Stores, Inc. v. Superior Court, 34 Cal. 4th 319, 337 (2000) (applying the Ramirez framework to the "primarily engaged in" requirement). Despite this potential, class-wide determination was appropriate on both questions in Sav-On, because the primary issue was whether certain activities were exempt or non-exempt. See id. at 330-31 ("As plaintiffs argued to the trial court, '[t]he only difference between Defendant's declarations and Plaintiffs' evidence is that the parties disagree on whether certain identical work tasks are "managerial" or "non-managerial."'"). This determination was similarly appropriate with regard to the professional and executive exemptions in this case. Because the court concluded that class members were not engaged in any activities satisfying those exemptions, there was no need to conduct the Ramirez "primarily engaged" analysis. As explained in the following sections, the Ramirez analysis is only slightly less cut and dried with respect to the administrative exemption.

### 2. Work Administering PwC's Clients

Work performed on behalf of an employers' clients may satisfy the administrative exemption. Class Cert. Order, 23:23-24:1, Webster v. Pub. Sch. Employees of Wash., Inc., 247 F.3d 910, 911,

37

915-17 (9th Cir. 2001); see also Roe-Midgett v. CC Servs., 512 F.3d 865, 868, 876 (7th Cir. 2008). Nonetheless, class members' work on behalf of PwC's clients does not satisfy the administrative exemption, because in performing such work, class members are subject to more than general supervision.

To be exempt as administrative employees, class members must satisfy one of subsections (c), (d), or (e) of Cal. Code Regs. tit 8 § 11040(1)(A)(2). PwC properly concedes that class members do not satisfy subsection (c), i.e., that members do not "regularly and directly assist[] a proprietor, or an employee employed in a bona fide executive administrative capacity." Therefore, class members would need to satisfy subsection (d) or (e), both of which require that employees work under only "general supervision."

The general supervision requirement has received relatively little interpretation. The 2002 DLSE Manual has provided a few illustrations of employees satisfying (d) and (e). The manual stated that subsection (d) was satisfied by "tax experts, insurance experts, sales research experts, wage-rate analysts, foreign exchange consultants, and statisticians." 2002 DLSE Manual § 52.3 ¶ 2. Subsection (e) includes "buyers, field representatives, and location managers for motion picture companies," as well as "customers' brokers in stock exchange firms and so-called 'account executives' in advertising firms." Id. ¶ 3. These examples merely repeat without explanation the phrase "under general supervision."

Obviously, some degree of supervision is not fatal to exemption. To the extent that the DLSE's examples illustrate the

38

meaning of "general" supervision, they suggest supervision in the form of review or approval of overall results and conclusions. This interpretation is consistent with a common-sense understanding of the term. Class members are subject to closer supervision than this. Unlike the various employees given in the DLSE examples, class members are subject to statutorily mandated "control and supervision [by] a certified public accountant." Cal. Bus. & Prof. Code § 5053. Professional rules similarly mandate supervision of class members. See, e.g., American Institute of Professional Accountants Professional Standards § 311.12 (Assistants should bring to the supervisor's attention "significant accounting and auditing questions raised during the audit so that he may assess their significance."), § 311.13 ("The work performed by each assistant should be reviewed to determine whether it was adequately performed."). PwC's own policies (no doubt informed by these requirements) subject class members to review of, and thereby supervision over, all the predicate steps and processes involved in their work. PwC's own training documents state that "[a]ll of the work that [associates] document will be reviewed by the team manager for that area." Kershaw Decl. II, Ex. 7, PWC 010230; see also id. at Ex. 6, PWC 02770.

PwC attempts to counter this argument by highlighting the degree of discretion and independent judgment exercised by class members. The "general supervision" and "discretion and independent judgment" elements of the administrative exemption are distinct. The two requirements occur in separate subsections, and while all

39

administrative employees must exercise discretion and independent

judgment, only some must work under no more than general

supervision. This court alluded to this distinction in the class

certification order by identifying several examples of employees

who could be said to exercise independent judgment despite the fact

that they were subject to supervision. Class Cert. Order, 33.[15]

Class members may exercise independent judgment in completing the

steps of the audit (the court does not reach this issue), but this

possibility does not call into question the conclusion that

whenever class members make decisions, those decisions are subject

to supervision.

It may be that, as a matter of law, the supervision mandated

by Cal. Bus. & Prof. Code § 5053 precludes any unlicensed

accountant from falling within the administrative exemption.

Absent illustrations of other supervisory schemes that comply with

this section, the court declines to address this issue. As to the

instant case, the evidence of PwC's supervision of class members,

interpreted in the light most favorable to PwC, does not raise a

triable question as to whether class members are subject to only

general supervision in performing the steps of an audit.

Accordingly, class members' accounting work, which includes all the

---

[15] In discussing the "discretion and independent judgment" requirement, I held that "the fact that the work of PwC associates and senior associate[s] is subject to review is not sufficient to prove that they are performing non-exempt work." Class Cert. Order, 33. That statement, however, did not address the administrative exemption's separate general supervision requirement.

work that allegedly administers clients, is necessarily subject to more than general supervision, and therefore nonexempt.

### 3. Administering PwC

Defendant identifies a limited range of purportedly administrative work class members perform on behalf of PwC. This includes supervising junior associates, participating without authority in hiring and recruiting, participating in internal committees, such as the "great place to work" committee, evaluating the performance of people class members supervise, and proposing draft engagement budgets.

Much of this work is not administrative. As explained by the former federal regulations cited by the wage order, an employee whose work "directly relate[s] to management policy or general business operations" is one who "determines or effects . . . policies," former C.F.R. 29 § 541.205(c)(3), or who "obtain[s] solutions to complex business, scientific, or engineering problems," § 541.204(c)(7). Supervision of junior associates, participation in recruiting, and evaluation of other associates are clearly outside the scope of this requirement.

The remaining activities are insufficient to support exemption. It may be that these activities are also not exempt. Both may be unrelated to management policy or operations, and in proposing budgets, associates may be subject to more than general supervision. Even assuming that these activities are exempt, however, it is clear that class members are not "primarily engaged" in them. PwC does not reasonably expect class members to spend

more than half of their time proposing budgets or working on internal committees, and there is no evidence that any class member actually spends their time in this way. PwC's argument is that these tasks, coupled with performance of other exempt work, warrant exemption. This argument fails because the court has held that class members are not engaged in any other form of exempt work. Class members are therefore not exempt under the administrative exemption. Accordingly, class members are not exempt, and plaintiffs' motion for summary judgment is granted.

**D. Remaining Issues.**

PwC's motion raises a number of other issues separate from the question of exemption, to which plaintiffs have not responded.[16] Summary adjudication is appropriate for PwC as to two of these issues: plaintiffs' claims for waiting time penalties and for punitive damages.

### 1. Waiting Time Penalties

An essential element of plaintiffs' claim for waiting time penalties is that the defendant "willfully" withheld wages. Cal. Labor Code § 203. A "'good faith dispute' that any wages are due will preclude imposition of waiting time penalties . . . ." Cal. Code Regs. tit. 8, § 13520. Here, PwC's defense demonstrates the existence of such a good faith dispute. § 13520(a). This question involved application of several provisions of the wage order that

---

[16] Plaintiffs' failure to address these issues is particularly noteworthy in light of the fact that the court granted plaintiffs' permission to file a 55 page opposition to PwC's motion.

have previously received only unclear interpretation, and which defendant could have reasonably believed exempted class members. Therefore, as a matter of law, PwC did not act "willfully" in classifying class members as exempt, and the claim for waiting time penalties must be dismissed.

### 2. Punitive Damages

PwC also argues that plaintiffs' are not entitled to punitive damages on their claims relating to failure to pay overtime, missed meal periods, itemized wage statements, and violation of California's Unfair Competition Law. By not addressing this aspect of PwC's motion, plaintiffs have abandoned their claims for punitive damages. Moreover, the court notes that an order in the related case of <u>Le/Kress v. PricewaterhouseCoopers</u>, No. 08-cv-965, 16 (E.D. Cal. Aug. 18, 2008) held that punitive damages were unavailable for all but the first of these claims.

## IV. CONCLUSION

For the reasons stated above, the court GRANTS plaintiffs' motion for summary adjudication on the issue of exemption. Class members are not exempt under the 2001 wage order. The court conversely DENIES IN PART defendant's cross-motion, as it pertains to this issue. However, the court GRANTS IN PART defendant's cross-motion for summary adjudication on the issues of waiting time penalties and punitive damages.

The court notes that the determination regarding exemption is one involving a controlling question of law, that there is substantial ground for difference of opinion, and that an immediate

43

1  appeal from the order will materially advance the ultimate
2  termination of the litigation.
3      ACCORDINGLY, the court certifies the matter for interlocutory
4  appeal pursuant to 28 U.S.C. § 1292.
5      IT IS SO ORDERED.
6      DATED:  March 10, 2009.
7
8
9                          LAWRENCE K. KARLTON
10                         SENIOR JUDGE
                           UNITED STATES DISTRICT COURT
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26